**Boyd F. BRACK, Appellant,**

v.

**Ray B. MOSSMAN, Elwin T. Jolliffe, Howard R. Bowen, the State Board of Regents of the State of Iowa, et al., Appellees.**

No. 53592.

Supreme Court of Iowa.

Sept. 5, 1969.

Cahill, Lovelace & Poula, Iowa City, for appellant.

Richard C. Turner, Atty. Gen., Elizabeth Nolan and Roger Ivie, Asst. Attys. Gen., and Arthur O. Leff, Special Counsel, for appellees.

LeGRAND, Justice.

This is a class action by an Iowa City taxpayer against Ray B. Mossman, Elwin T. Jolliffe, and Howard R. Bowen, who are respectively treasurer, vice president and president of the University of Iowa; against the Board of Regents of the State of Iowa; and against the individual members of the Board. For convenience we refer to the Board of Regents, or the Board, as though it were the sole defendant.

Plaintiff brought this action in equity alleging the action of the Board in authorizing construction of a multi-level parking ramp under chapter 262, Code of Iowa, 1966, is illegal and void. He asked a permanent injunction to restrain the Board and to enjoin the issuing of bonds to pay for the work.

Defendant asked a declaratory judgment to determine the bonds, when issued, will be legal and binding.

The trial court's decree found the actions of the Board to be valid and binding. It also held bonds proposed to be issued would be legal and enforceable according to their terms.

The plaintiff relies on two propositions for reversal. They are: (1) The building of the parking ramp conflicts with chapters 390 and 390A and with section 389.12, Code of Iowa, 1966, which grant to cities and towns the jurisdiction to acquire, construct, operate and maintain parking lots and off-street parking areas, together with supervision and control over all public highways, streets, avenues, alleys, public squares and commons within the city. As part of this proposition plaintiff asserts the building of the ramp places the university in illegal competition with the city; and (2) the parking ramp project violates chapter 262, Code, for reasons hereafter discussed, including the claim the method of financing authorized is unconstitutional because under its terms the state incurs a debt without complying with section 5, Article VII, Constitution of Iowa.

There is little dispute concerning the facts. Defendant has admitted practically all allegations of the plaintiff's petition except those dealing with the issue of constitutionality and legality. The record shows the university maintains numerous parking facilities spotted around its campus. Most are nonmetered surface lots. Several are metered and one, across the street from the Student Union, is a metered ramp.

When this suit was started, approximately 33 acres of university land were devoted to parking. These included nine metered areas with 696 parking spaces for faculty, staff, students and visitors; one free parking lot near the field house providing 153 parking spaces for visitors; 32 lots reserved for faculty and staff with 2731 parking spaces; nine lots (plus some dormitory parking space) reserved for students providing 1093 parking spaces; and three so-called storage lots with 629 parking spaces for students.

In all there were 5302 parking spaces available at that time.

As the needs change, there is a constant alteration in the university parking picture. Projected improvements and alterations suggest that by June 30, 1976, 2603 of the present parking spaces will be eliminated and 4714 new ones added—a net gain of 2111 parking spaces.

For the 1967–68 school year the total student enrollment was 18,659. The students brought with them to Iowa City a total of 8147 cars and 455 two-wheeled vehicles, a substantial increase over the previous school year.

Legal parking on university facilities is accomplished by permit issued by the university at a cost of $60.00 for 12 months or $45.00 for nine months. In 1967–68, 5508 permits were issued to faculty, staff and students. It will be noted this number actually exceeded the total number of parking spaces available. In addition to these groups there are 1000 to 1500 visitors' automobiles for which space must be found every day.

It is apparent from these statistics that present parking facilities for university purposes are inadequate and are likely to remain so for some time. The trial court so found and we agree.

Financially, too, the operation is big business. In the fiscal year ending June 30, 1968, the university received gross income of $411,337.38 from parking fees. At the

time of trial it was estimated the next fiscal year, ending June 30, 1969, would increase that total to $484,500.00 from parking permit fees, special fees from those attending conferences and meetings, meter money, and fines for prohibited parking.

Against this background the Board of Regents in October, 1967, approved plans and awarded contracts for the construction of a multi-level parking ramp structure on the site of a then existing surface parking lot just west of the University Hospitals. It is this action which is challenged here by plaintiff.

The ramp has now been completed, but the bonds authorized by the Board to meet construction costs have not been printed, issued or sold.

The ramp contains 514 parking spaces. Forty-nine are reserved for staff and faculty at the hospital. The remaining 465 are open to all—staff, faculty, students and visitors. Those using the ramp receive a ticket from an automated machine and pay a cashier when leaving. The machine records the time of entry and the cashier computes the cost at the time of departure. Rates are fixed according to a graduated schedule not to exceed $1.50 for 24 hours.

It is conceded the net revenue from this parking ramp alone will not be sufficient to meet the bond obligation, but the revenue produced from the entire parking operations of the university will be more than adequate to do so. The bonds, when issued, will pledge the income from the entire integrated parking system to their payment. As the amount of the outstanding bonds is reduced, the net revenue will help finance the construction of other parking ramps on the campus, several of which are already scheduled between 1971 and 1976.

The evidence showed this parking facility would probably be used by hospital staff and faculty, hospital visitors (including students), and medical, nursing, pharmacy and dental students.

The completion of the ramp also permits a surface parking lot in the same general area, previously used for hospital parking, to be converted to student parking. According to the evidence, this is one of the advantages of new parking facilities. As such facilities are built, their use frees other over-crowded or inadequate parking areas for more general use.

We adopt and approve the following specific findings of fact as made by the trial court:

"I expressly find the parking ramp * * and the entire University parking system are necessary for the comfort, convenience and welfare of the State University of Iowa students and are suitable for the purpose for which the State University of Iowa was established.

"I further expressly find that the parking ramp and the entire University parking system are integral parts of the whole University function.

"I further expressly find that the actions of the Board of Regents * * * are all specifically authorized by 1966 Iowa Code Sections 262.44 through 262.53, inclusive.

"I further expressly find that the bonds [to be issued in payment for the ramp] are to be paid only out of the net revenue from the University's consolidated parking facilities operation, and no other funds or assets are pledged or otherwise obligated for use in paying the bonds. The general credit of the State of Iowa is specifically excluded * * *."

No objection is made to the procedure by which the Board authorized the construction of the ramp, and the appeal raises only the right to do so at all under the facts already recited.

I. Plaintiff first asserts a conflict between chapters 390 and 390A (as well as section 389.12), Code of Iowa, 1966, and chapter 262 of the same code.

Chapters 390 and 390A grant to cities and towns the right to build and operate

parking facilities within their boundaries. Section 389.12 vests in municipalities the duty to supervise and control all public highways, streets, avenues, alleys, public squares and commons. Section 262.44 authorizes the Board to "set aside and use such portions of the respective campuses * * * as [it] deems necessary for * * parking structures and areas * * *." Plaintiff argues that this provision in section 262.44 permits the university to enter into parking business in competition with the city. He concedes there is no specific constitutional prohibition which forbids this but claims it is nevertheless objectionable as being beyond proper governmental object and purposes. This same issue was raised in Iowa Hotel Association v. State Board of Regents, 253 Iowa 870, 884, 114 N.W.2d 539, 547. There we said, "If it is necessary and proper for the university to provide housing for students, it is difficult to conclude that providing housing for guests of the university is an unconstitutional invasion of the rights of the people. Incidental competition is not a basis for an injunction against a state agency engaged in the performance of the constitutional and statutory function."

We believe that statement is equally applicable here. We hold it is both necessary and proper to provide parking facilities for students and visitors who have business with the university.

None of the authority cited by plaintiff is in point. Some of his cases rely on constitutional or statutory provisions substantially different from our own, while others involve governmental agencies which undertook to compete *generally* in some business activity. Plaintiff relies on Rippe v. Becker, 56 Minn. 100, 57 N.W. 331; White Eagle Oil and Refining Company v. Gunderson, 48 S.Dak. 608, 205 N.W. 614, 43 A.L.R. 397; In re Opinion of Justices, 182 Mass. 605, 66 N.E. 25, 60 L.R.A. 592; State v. Kelly, 71 Kan. 811, 81 P. 450, 70 L.R.A. 450; State ex rel. Kansas City v. Orear, 277 Mo. 303, 210 S.W. 392; Union Ice and Coal Company v. Town of Ruston, 135 La. 898, 66 So. 262; Baker v. City of Grand Rapids, 142 Mich. 687, 106 N.W. 208; State ex rel. City of Toledo v. Lynch, 88 Ohio St. 71, 102 N.E. 670.

We have reviewed all of these cases and find they involve circumstances in which the State or some other governmental body entered into the operation of grain elevators; the sale of gasoline; construction of oil refineries; manufacture and sale of ice; sale of coal; and the operation of motion picture theaters.

None of these is factually comparable to the situation presented here and none lends any support to plaintiff's contention which would prohibit the university, while carrying on its "constitutional and statutory functions," from engaging in any activity which incidentally competed, no matter how slightly, with the business activity of others.

We find no merit in this proposition urged by plaintiff, who seemed to place only faint hope in it himself.

II. Plaintiff rests his main argument on the claim the parking ramp does not come within the terms of facilities authorized under section 262.44, Code, and further that the statute is unconstitutional because it permits the Board to contract a debt on behalf of the State in violation of section 5, Article VII, Constitution of Iowa.

The pertinent parts of section 262.44 are as follows:

"The state board of regents is authorized to:

"1. Set aside and use such portions of the respective campuses of the institutions of higher education under its control, namely, the state university of Iowa, * * * as the board shall determine to be suitable for the construction thereon of self-liquidating and revenue producing buildings and facilities, which the board deems necessary for the comfort, convenience and welfare of their students and suitable for the purposes for which the institutions were

established, including * * * parking structures and areas * * *.

"2. Acquire by any lawful means additional land deemed by the board to be desirable and suitable for any or all of the aforesaid purposes.

"3. Construct, equip, furnish, maintain, operate, manage and control any or all of the buildings, structures, facilities, areas, additions or improvements hereinbefore enumerated."

Plaintiff asserts the ramp violates this statute on two scores: (1) It is not for the "comfort, convenience, and welfare" of the students; and (2) It is not self-liquidating because its operating income will not *alone* be sufficient to pay off construction costs.

■ III. We consider first whether the facility will serve the "comfort, convenience, and welfare" of the students as that term is used in section 262.44. The Board decided it would; the trial court found to the same effect. We agree with the trial court and hold the record shows the improvement here in dispute easily meets that statutory requirement.

The evidence dramatically shows the necessity for additional university parking. It is a matter of common knowledge that adequate parking is vital in any endeavor which asks members of the public to come to that place, wherever it may be, where merchandise is sold or services rendered. In this era of private automobile transportation parking is the sine qua non of almost any venture, and this is certainly true of an educational institution which each day must see that almost 10,000 people have a place to put their cars.

The parking ramp under discussion is intended to serve the University Hospital where various university students are partially educated. Among them are those who will later become doctors, nurses, pharmacists, and dentists.

Plaintiff demurs to the manner in which the parking ramp is used because it is of convenience to staff, faculty and visitors as well as students. It is hard to imagine how the welfare of students could be served without either staff or faculty; and, it is equally difficult to understand, when discussing a hospital where students are being trained in all areas of health care how the fact that those who are visiting patients in that hospital may incidentally use the parking ramp renders it subject to plaintiff's objection.

We believe what we said in Iowa Hotel Ass'n. v. State Board of Regents, 253 Iowa 870, 879, 114 N.W.2d 539, 544, applies here as well, but plaintiff attempts to distinguish the two by pointing out our decision there found the Memorial Union was used as an "integral part of the whole university function." The parking ramp, he asserts, serves only a relatively few students and benefits the general public more than the student body.

We cannot accept plaintiff's argument. Perhaps the Memorial Union is used by more students in the *social and cultural life* of the university, but it does not follow it is more an integral part of the whole university function than those buildings and facilities which are devoted exclusively to the *educational* purposes of the school. Each has its important place in the university community.

It could hardly be seriously argued the hospital is not "an integral part of the whole university function" as we explained that term in the Iowa Hotel case.

There is no merit in plaintiff's claim the parking ramp does not serve the "comfort, convenience and welfare" of the students.

■ IV. Plaintiff concedes the "big issue" is whether this is a self-liquidating project. If not, it creates an indebtedness which the State is obligated to pay. This would violate section 5, Article VII of our Constitution. If the income from this facility alone would pay off the cost of its construction, there could be no question raised. Iowa Hotel Ass'n. v. Board of

Regents, supra. Plaintiff admits as much. However, the record shows such income will not be sufficient to do so. The bonds which the Board intends to issue will pledge not only the income from the new parking ramp but also the income from the entire university parking system. It is this to which plaintiff objects.

Before discussing this further we mention that the method of financing set up in chapter 262, Code, is the so-called special-fund theory which has long been approved by virtually all states.

It permits public improvements to be constructed without resort to taxation and without pledging the credit of the State to payment. Payment is made from the income of the improvement itself. It is universally held such financing does not create a debt within the definition of that term as used in most state constitutions.

That this is a popular and approved practice see annotations at 72 A.L.R. 695, 96 A.L.R. 1393, and 146 A.L.R. 328.

Iowa is among the many states which have adopted its use. Chitwood v. Lanning, 218 Iowa 1256, 1257, 257 N.W. 345, 346; Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 58, 296 N.W. 770, 777, 780, 146 A.L.R. 315; Iowa Hotel Ass'n. v. State Board of Regents, 253 Iowa 870, 879, 114 N.W.2d 539, 544; Green v. City of Mt. Pleasant, 256 Iowa 1184, 1203, 131 N.W.2d 5, 18.

Courts which have dealt with special-fund financing are split into two groups. Some limit the governmental unit involved to those projects which will be completely self-liquidating from the income obtained from the new construction itself. Others permit the use of income from such construction and income from already existing facilities to defray the new construction costs.

Plaintiff is asking us to adopt the first or *strict* special-fund doctrine rather than the last or *broad* theory. He relies most heavily on Boe v. Foss, 76 S.Dak. 295, 77

N.W.2d 1, 10, which accepted the strict theory in ruling income from existing university dormitories could not legally be applied toward financing new ones.

The South Dakota court held the effect of permitting such withdrawal of money to which the State was already entitled inevitably required the spending of tax money to replace it. It held this created a state debt. Several other jurisdictions follow this formula.

We make no attempt to distinguish this case from the present one. We only say it represents the minority view and one with which we cannot agree. As said in Lacher v. Board of Trustees, 243 Md. 500, 221 A.2d 625, 630, the South Dakota doctrine is followed by only "a small minority of courts."

The overwhelming weight of authority is to the contrary. Most courts hold that financing such as the Board proposes here —when authorized by statute and when the State cannot become obligated to pay— does not create a debt against the State.

Section 262.49, Code, provides in part:

"No obligation created hereunder *shall ever be or become a charge against the state of Iowa* but all such obligations, including principal and interest, shall be payable solely:

"1. From the net rents, profits and income arising from the property so pledged or mortgaged,

"2. *From the net rents, profits, and income which has not been pledged for other purposes arising from any similar building, facility, area or improvement under the control and management of said board.*

"3. From the fees or charges established by said board for students attending the institution for use or availability of the building, structure, area, facility or improvement for which the obligation was incurred * * *" (Emphasis added.)

In addition the record shows the bonds themselves, when issued, will contain a

clause limiting the source of their payment to parking revenue only.

It is beyond dispute section 262.49(2) intended that income from the *already existing parking system* could be applied to pay for new construction of like type. It is clear the existing system consists of "similar building[s], facilit[ies], area[s], and improvement[s]" whose income the statute says may be used for this purpose.

But plaintiff says the statute cannot constitutionally accomplish this because, regardless of its terms, it burdens the State with an obligation to pay the indebtedness incurred by the Board. If it does, plaintiff is correct in saying it violates section 5, Article VII of the Constitution. We deem it unnecessary to discuss the provisions of Article VII since we hold no state indebtedness arises under the circumstances already set out.

Our conclusion has support from the courts of many other jurisdictions, including State ex rel. Board of Governors v. O'Brien, 142 W.Va. 88, 94 S.E.2d 446, 449; City of Maryville v. Cushman, 363 Mo. 87, 249 S.W.2d 347, 351, 352; Roach v. City of Columbia, 172 S.C. 478, 174 S.E. 461, 462; City of Oxnard v. Dale, 45 Cal.2d 729, 290 P.2d 859, 861, 863; Lacher v. Board of Trustees of State College, 243 Md. 500, 221 A.2d 625, 630; Opinion of Justices, Me., 231 A.2d 431, 435; City of Palm Springs v. Ringwald, 52 Cal.2d 620, 342 P.2d 898, 901; Skidmore v. City of Elizabethtown, Ky., 291 S.W.2d 3, 5; Button v. Day, 204 Va. 270, 130 S.E.2d 459, 461.

Detailed discussion of these authorities would unduly extend this opinion, but excerpts from several will illustrate their general philosophy.

In City of Oxnard v. Dale, supra, 290 P.2d at pages 861 and 863, the California Supreme Court said:

"Some of the courts in other jurisdictions have held that revenue bonds payable solely from a special fund will not be free from the constitutional limitation unless the fund is restricted to the revenues from the particular improvement which is to be constructed out of the proceeds of the bonds in question, but under the prevailing view the doctrine may be applicable where the revenues of the entire existing system, as well as those of the proposed improvement, are pledged. * * * [A]n obligation which is payable out of a special fund is not an 'indebtedness or liability' of a governmental body within the meaning * * * of the Constitution if the governmental body is not required to pay the obligation from its general funds, or by exercise of its powers of taxation, should the special fund prove insufficient. Respondents concede, as they must, that the special fund doctrine would be applicable and controlling here if the revenues pledged to secure the proposed bonds were secured by the revenues to be produced from the interceptor lines alone. Insofar as concerns the constitutional limitation, we can see no sound reason to distinguish between that situation and the one presented here where the pledge consists of the revenues of the entire system and where those revenues had formerly been used to make payments on the city's general obligation bonds."

In Lacher v. Board of Trustees, supra, at page 629 of 221 A.2d, we find, "Almost all of the many states which have adopted the special fund doctrine * * * have held the pledge of future revenues by a state agency from an existing enterprise or building to sweeten the pot available from the future revenues from the facility * * * to be constructed from the proceeds of revenue bonds does not amount to the creation of a debt by the state." Numerous cases are cited in support of this including Iowa Hotel Association v. State Board of Regents, supra.

In addition we believe the rationale in Iowa Hotel Ass'n. v. Board of Regents, supra, while perhaps not determinative of the precise point here raised, clearly points out our preference for the broad special-

fund theory adopted by the great majority of the courts.

We find no conflict in this view with either Hubbell v. Herring, 216 Iowa 728, 249 N.W. 430, or State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737. Both of these rest on a finding that a tax was to be levied to provide funds for payments required and that a State debt was thereby created contrary to the constitutional safeguards in Article VII. No such circumstance exists here. See also Iowa Hotel Ass'n. v. State Board of Regents, supra, at page 878 of 253 Iowa Reports, at page 544 of 114 N.W.2d.

Even in the Hubbell case, however, appears this statement with apparent approval at page 736, at page 434 of 249 N.W.: "The courts of many jurisdictions have sustained the constitutionality of legislative enactments providing for the issuance of bonds * * *, payment thereof to be made solely out of a special fund authorized by the respective acts, the said fund to be raised wholly by other methods and without the imposition of a tax upon property."

We hold the project under review did not create a debt against the State. The enabling statute so provides; the bonds contain such a provision; there is no alternative procedure by which the State could be compelled to pay. Iowa Hotel Ass'n. v. State Board of Regents, supra.

V. We believe what we said in Division IV and the authorities there cited also dispose of plaintiff's attack on the constitutionality of section 262.44 and related sections.

The constitutional objection asserts a debt of the State is created in violation of section 5, Article VII. Since we have held no State indebtedness arises under the statutory method of financing it, it follows we find no conflict between the statute and Article VII.

VI. To summarize, we hold the method of financing adopted by the Board is authorized under chapter 262; that this plan does not create a State debt; that there is no procedure by which the State could become obligated to pay the bonds issued by the Board of Regents; that the action of the Board does not contravene the Constitution of Iowa, particularly section 5, Article VII thereof; and that the project is a self-liquidating one under the statute.

We affirm the decree of the trial court.

Affirmed.

All Justices concur, except LARSON, J., who takes no part.