William GOREHAM, David Liddle, Dighton Smith, and Lloyd Bock, Appellants,

v.

DES MOINES METROPOLITAN AREA SOLID WASTE AGENCY et al., Appellees.

No. 54242.

Supreme Court of Iowa.

Sept. 2, 1970.

Tesdell, Miller, Rydell & Hall, Des Moines, for appellants-cross-appellees.

Philip T. Riley and M. A. Iverson, Des Moines, for appellees-cross-appellants Des Moines Metropolitan Area Solid Waste Agency, Town of Altoona, City of Ankeny, Town of Carlisle, Town of Clive, City of

Des Moines, Town of Grimes, Town of Pleasant Hill, County of Polk, City of Urbandale, City of West Des Moines, City of Windsor Heights, Town of Mitchellville, Town of Polk City, Town of Elkhart, Town of Runnells, Town of Bondurant.

Edwin Skinner, Altoona, for appellees-cross-appellants Town of Altoona and Town of Runnells.

James B. West, Des Moines, for appellee-cross-appellant Town of Clive.

Roy W. Meadows, Des Moines, for appellee-cross-appellant Town of Grimes.

Don C. Swanson, Des Moines, for appellee-cross-appellant Town of Pleasant Hill.

Harley A. Whitfield, Des Moines, for appellee-cross-appellant Town of Urbandale.

Jack W. Rogers, Des Moines, for appellee-cross-appellant City of West Des Moines.

Frank W. Davis, Jr., Des Moines, for appellee-cross-appellant City of Windsor Heights.

F. H. Forrest, Des Moines, for appellee-cross-appellant Town of Polk City.

Walter W. Selvy, Des, Moines, for appellee-cross-appellant Town of Elkhart.

Edward J. Kelly, Des Moines, for appellee-cross-appellant Town of Bondurant.

LARSON, Justice.

This is a declaratory judgment action involving the validity of a contract and the constitutionality of chapter 28E, Code of Iowa 1966, and chapter 236, Acts of the Sixty-third General Assembly, submitted upon an agreed stipulation of facts.

Plaintiffs, who are residents, property owners, and taxpayers of the cities of Des Moines and West Des Moines, Iowa, brought this action at law against the Des Moines Metropolitan Area Solid Waste Agency (hereafter called the Agency) and its members asking an interpretation of chapter 28E, Code of Iowa 1966, and chapter 236, Acts of the Sixty-third General Assembly, First Session, with reference to the power and authority of the Agency under those laws. The vital question presented is whether under these statutes and the Iowa Constitution the Agency can issue bonds to finance the planned functions of the Agency in the collection and disposition of solid waste, and pay the interest and principal from fees legally collectible from its members for this service. The trial court held that the Agency was properly created, that due authority was properly delegated to it, that the submitted agreement between the members was valid, and that it could issue such revenue bonds and fix and collect fees from those using these services including interest and principal on the bonds, but held the participation by Polk County was limited to disposition of solid waste only and did not permit participation in collection costs. Plaintiffs appeal as to the creation of the Agency, the propriety of the authority delegated, and the legality of the agreement, and defendants cross-appeal as to the limited participation by Polk County. Due to the importance of this issue, special attention is given this problem.

The object or purpose of the involved legislation is clearly stated and relates to the health, safety and welfare of the people, involves a service and facility needed, and directs a liberal construction to accomplish a worthy purpose. After careful study and research, we conclude neither the legislation nor the contract involved are violative of the Iowa Constitution.

The record before us consists of the pleadings, an extended stipulation of the parties including the exhibits referred to therein, the trial court's findings of fact and conclusions of law, and the judgment entry filed April 16, 1970.

Appellants' principal contention as stated in their petition is that the defendant Agency under the provisions of said "Intergov-

ernmental Agreement, Exhibit A", may receive revenues directly from the defendant municipality members thereof and that as a result, the defendant municipality members are each required to pay said bonds from the general funds of each said municipality for the costs of acquisition and construction of said site and facilities and that said bonds are therefore indebtedness of the participating defendant municipality members within the meaning of Article XI, Section 3, of the Constitution of the State of Iowa, notwithstanding the provisions of said resolutions requiring payment from a sinking fund or special fund set apart for the purpose.

Appellants further contend that the defendant Agency is invalid and has no legal character as a "public body corporate and politic" for the reason that chapter 28E of the 1966 Code of Iowa and Senate File 482 (also known as chapter 236, Acts of the 63rd General Assembly, First Session) under which said Agency was created is in violation of Article III, Section 1, of the Constitution of the State of Iowa, as an improper delegation of legislative authority, and that as a result the creation of said Agency by the "Intergovernmental Agreement, Exhibit A", is ultra vires and of no force and effect, and that as a consequence thereof said defendant Agency is without authority to issue revenue bonds pursuant to Senate File 482 enacted by the 63rd General Assembly of Iowa.

Fairly summarized, the Stipulation of Facts filed herein on March 30, 1970, states as follows:

On August 8, 1966, the City Manager of the defendant City of Des Moines, by memorandum to the City Council, informed it that the city was confronted with a serious problem relating to the collection and disposal of solid waste, in that the solid waste facility operated by the City of Des Moines was fast filling up. The impact of the report was heightened by the fact that the local units of government in the near metropolitan Des Moines area

were using the Des Moines dump to a greater extent for the disposition of some or all of their solid waste and were using local dumps in the area surrounding Des Moines to a lesser extent for the disposition of a portion of their solid waste. The memorandum proposed a study and demonstration project for the metropolitan area which contained approximately 430 square miles. The manager recommended that the communities in the metropolitan area engage in a cooperative effort in disposing of their solid waste.

A proposal was made to the office of Solid Waste of the United States Department of Health, Education and Welfare for matching federal funds and that office authorized a grant of federal funds to the City of Des Moines, which authorization was dated March 20, 1967, in the sum of $72,989.00 toward a total one-year budget for the project of $109,484.00.

On November 28, 1966, the City Council of the City of Des Moines, by resolution, authorized the execution of a contract, conditioned upon the federal grant, between the City of Des Moines and the other thirteen governmental units in the metropolitan area. As a result consulting firms were employed to make a comprehensive detailed analysis of solid waste collection and disposal in the Des Moines metropolitan area and to make recommendations for the best means of collection and disposal of solid waste material for the governmental units involved for approximately twenty to twenty-five years in the future.

The report of Henningson, Durham & Richardson, Inc., was delivered to the City of Des Moines on May 16, 1968, showing in great depth of detail a complete analysis of the solid waste problem for the communities involved, together with specific recommendations for the solution of such problems.

Subsequent thereto the defendant municipalities entered into an agreement based upon the form suggested by the study, Ex-

hibit D, which said intergovernmental agreement created the Metropolitan Area Solid Waste Agency.

Pursuant to said agreement the Agency was duly organized, officers were elected and a director was hired to manage the affairs of the Agency under the direction of the Agency board which was composed of one representative from the governing body of each member of the Agency, each having one vote for every 50,000 or fraction thereof population in his area of representation.

On February 24, 1969, the Agency board authorized the preparation of an application to the United States Department of Health, Education and Welfare, Public Health Service, for funds for a project designed to demonstrate the implementation of a Metropolitan Solid Waste Management Plan, which said application covered a projected two-year period of operation commencing June 1, 1969, and ending May 31, 1971.

On June 24, 1969, the Department of Health, Education and Welfare, Public Health Service, issued its Notice of Grant Awarded, indicating a first year grant in the amount requested of $73,857.00 against matching local funding in the sum of $36,929.00. The application remains pending for the second year for which financial sources from federal funds have not yet been awarded.

On December 18, 1969, the Agency adopted a resolution with all members thereof concurring to the effect that the Agency may proceed to issue revenue bonds in the amount not to exceed 2¼ million dollars, and each of the municipality members of the Agency adopted a resolution in support of the Agency resolution to issue revenue bonds in such amount.

Specifically, appellants contend (1) that chapter 28E, Code of Iowa 1966, is unconstitutional because the legislature is without power to delegate to political subdivisions of the state the power to create a new quasi municipality for the purpose of exercising functions delegated by the legislature to it; (2) that chapter 28E is unconstitutional because it endeavors to delegate legislative power without providing a suitable legislative policy which sufficiently defines and limits the powers granted; (3) that the quasi municipality purported to be created has no power to issue general revenue bonds; that the bonds issued by the Agency, if valid, constitute general obligations of the participating political entities because the "special-fund" doctrine is not applicable for the reason that the agreement provides the Agency has the power to collect fees as assessed from each of its members as payment for providing the services of collection and disposal of waste; (4) that defendant Polk County has no authority from the legislature to participate in the operation of the defendant Agency; and (5) that the agreement creating the Agency is contrary to public policy to the extent that it provides that the governing board of the Agency will be comprised of an elected representative of the governing body of each participating governmental jurisdiction or his designated substitute.

I. Perhaps before discussing these contentions we should set out the provisions of the law in question.

Chapter 28E entitled "Joint Exercise of Governmental Powers" purports to authorize any political subdivision of the State of Iowa and certain agencies of the state or federal government to join together to perform certain public services and by agreement create a separate legal or administrative entity to render that service. Its worthy purpose is clearly expressed in section 28E.1. Section 28E.2 provides definitions, and section 28E.3 purports to define the limitations upon the participants as follows:

"28E.3. *Joint exercise of powers.* Any power or powers, privileges or authority exercised or capable of exercise by a public

agency of this state may be exercised and enjoyed jointly with any other public agency of this state having such power or powers, privilege or authority, and jointly with any public agency of any other state or of the United States to the extent that laws of such other state or of the United States permit such joint exercise or enjoyment. Any agency of the state government when acting jointly with any public agency may exercise and enjoy all of the powers, privileges and authority conferred by this chapter upon a public agency."

Sections 28E.4 and 28E.5 provide for the agreement and its contents as follows:

"28E.4. *Agreement with other agencies.* Any public agency of this state may enter into an agreement with one or more public or private agencies for joint or co-operative action pursuant to the provisions of this chapter, *including* the creation of a separate entity to carry out the purpose of the agreement. Appropriate action by ordinance, resolution or otherwise pursuant to law of the governing bodies involved shall be necessary before any such agreement may enter into force. (Emphasis supplied.)

"28E.5. *Specifications.* Any such agreement shall specify the following:

"1. Its duration.

"2. The precise organization, composition and nature of any separate legal or administrative entity created thereby together with the powers delegated thereto, provided such entity may be legally created.

"3. Its purpose or purposes.

"4. The manner of financing the joint or co-operative undertaking and of establishing and maintaining a budget therefor.

"5. The permissible method or methods to be employed in accomplishing the partial or complete termination of the agreement and for disposing of property upon such partial or complete termination.

"6. Any other necessary and proper matters."

II. Although appellants contend the creation of a separate legal entity or public body is solely a function of the legislature, we find no unconstitutional delegation of legislative power involved in this law providing for the creation of the Des Moines Metropolitan Area Solid Waste Agency. It is not the mere establishment or creation of such an agency or entity that causes trouble, but the functions to be performed by that agency in the legislative field which must be examined closely to determine whether there has been an unlawful delegation of legislative authority. See Lausen v. Board of Supervisors, 204 Iowa 30, 214 N.W. 682; Ross v. Board of Supervisors, 128 Iowa 427, 104 N.W. 506; State v. Rivera, 260 Iowa 320, 149 N.W.2d 127.

In Lausen, in upholding the constitutionality of what is known as the "Bovine Tuberculosis Law", this court stated at page 34 of 204 Iowa, page 685 of 214 N.W., "We think that the state has the power to select any reasonable means and methods it may choose, to establish these (area-eradication) districts, so long as they are in the interest of public health; * * *."

In this connection it must also be noted that administrative agencies may be delegated certain legislative functions by the legislature when properly guidelined, and that when this is done, the distinction between such agencies and public bodies, corporate and politic, which have been delegated proper legislative functions, has largely disappeared. Ordinarily the latter body is created by an act of the legislature and the former by an already-established public body with legislative authority. However, the power and authority of each must be measured by the legality of the delegation thereof. If such power is derived from the State Legislature, is adequately guidelined, and does not violate the separation-of-powers provision of the State Constitution set forth in Article III, Sec-

tion 1, the exercise thereof should be sustained.

Thus, our primary problem here is whether the authority provided in chapter 28E of the 1966 Code and chapter 236, Acts of the Sixty-third General Assembly, constitutes a lawful delegation of legislative power.

■ III. Regularly-enacted statutes are presumed to be constitutional, and courts exercise the power to declare such legislation unconstitutional with great caution. It is only when such conclusion is unavoidable that we do so. Lee Enterprises, Inc. v. Iowa State Tax Comm., Iowa, 162 N.W. 2d 730; State v. Rivera, supra, 260 Iowa 320, 149 N.W.2d 127; Cook v. Hannah, 230 Iowa 249, 297 N.W. 262. Also see Farrell v. State Board of Regents, Iowa, 179 N.W. 2d 533, decided September 2, 1970.

Thus, while the provisions of section 28E of the 1966 Code leave much to be desired as to the extent of the authority granted to such a newly-created entity, the presumption of constitutionality operates strongly in its favor.

■ It is also well to remember that our function is not to pass upon the feasibility or wisdom of such legislation, but only to determine whether the power here exercised exceeds that which the legislature could or did delegate to the newly-created entity. Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, and authorities cited.

■ In this regard it is also well to note the importance of the expressed or recognized purpose or policy to be achieved by the legislation. Generally, when the legislature has adequately stated the object and purpose of the legislation and laid down reasonably-clear guidelines in its applicaton, it may then delegate to a properly-created entity the authority to exercise such legislative power as is necessary to carry into effect that general legislative purpose. See Schmidt v. Department of

Resources Development, 39 Wis.2d 46, 158 N.W.2d 306, 313; Chicago & North Western Ry. Co. v. Public Service Comm., 43 Wis.2d 570, 169 N.W.2d 65, 69; 1 Davis, Administrative Law Treatise, pp. 75–76, § 2.01.

The purpose of this legislation, as recognized in chapter 28E, is to provide a solution to the growing problems of local government including the problem of collection and disposal of solid wastes by public bodies and to cooperate with the Office of Solid Waste of the United States Department of Health, Education and Welfare to accomplish that purpose by joint efforts. We further observe that this purpose may soon be made a legal requirement for all communities throughout the entire land under federal law. We are satisfied that this is health and general welfare legislation and that the legislative policy and purpose for chapter 28E is sufficiently stated. It amounts to this, that public agencies or governmental units may cooperate together to do anything jointly that they could do individually.

■ True, if chapter 28E is examined without reference to the powers granted the various governmental units by other legislation, the factors constituting sufficient guidelines might well be said to be insufficient. But this legislation must be interpreted with reference to the power or powers which the contracting governmental units already have. The pre-existing powers contain their own guidelines. The legal creation of a new body corporate and politic to jointly exercise and perform the powers and responsibilities of the cooperating governmental unit would not be unconstitutional so long as the new body politic is doing only what its cooperating members already have the power to do. This would be true under the above-recognized general rule that a statute is presumed to be constitutional until shown otherwise beyond a reasonable doubt.

Chapter 28E does not attempt to delineate the various governmental or proprie-

tary functions which the individual governmental units may be implementing. While such a broad approach may be unwise, as appellants argue, it is not unconstitutional so long as the cooperating units are not exercising powers they do not already have.

With this in mind, it appears that chapter 28E supplies sufficient guidelines for the purposes necessary to the chapter. That is, the units are authorized to handle what might be called the mechanical details of implementing the joint project either by the creation of a separate entity or by using a joint administrator or board for the purpose of implementing the agreement reached. The agreement itself, of whatever nature, must have its specific contents delineated in section 28E.5 and specifically prohibits governmental units being involved in the new entity, except insofar as the new entity is in fact performing the same responsibilities as the units involved.

■ Thus, when the entire chapter is examined, it would appear that the delegations of power to the governmental units made by the legislature in chapter 28E are constitutional.

IV. Appellees rely heavily on chapter 236, Acts of the 63rd General Assembly, to sustain the validity of their contract and the Agency's power to issue bonds and pay for them with special funds obtained by service-user assessments. The legislature did not give the Agency, when created, the carte blanche authority to collect and use funds as it might "legislatively" determine. The use of the special funds to be obtained by assessments is prescribed, and the law specifically states the obligation to collect these funds to pay off the bonds is not to be construed to create a debt of the member. We have often recognized and embraced the special-fund doctrine and given it a liberal construction. Green v. City of Mt. Pleasant, supra, 256 Iowa 1184, 131 N.W.2d 5; Wickey v. Muscatine County, 242 Iowa 272, 46 N.W.2d 32; Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 296 N.W. 770; Iowa Hotel Ass'n v. State Board of Regents, 253 Iowa 870, 114 N.W.2d 539; Brack v. Mossman, Iowa, 170 N.W.2d 416; Farrell v. State Board of Regents, Iowa, 179 N.W.2d 533, decided September 2, 1970. We believe the "special-fund" concept is applicable here.

Since the contract cannot be sustained if chapter 236 is unconstitutional, we next direct our attention to its language and provisions. The delegation of power granted in chapter 236, Acts of the 63rd General Assembly, First Session, is specific as to the power to tax, borrow money, and issue revenue bonds. It provides in section 3 as follows:

"§ 3. *Revenue bonds.* An entity created to carry out an agreement authorizing the joint exercise of those governmental powers enumerated in section three hundred ninety-four point one (394.1) of the Code shall have power to construct, acquire, repair, improve, expand, operate and maintain a project or projects necessary to carry out the purposes of such agreement, and to issue from time to time *revenue bonds payable from the revenues derived from such project or projects,* or any combination of such projects, to finance the cost or part of the cost of the acquisition, construction, reconstruction, repair, extension or improvement of such project or projects, including the acquisition for the purposes of such agreement, of any property, real or personal or mixed therefor. The *power* of the entity *to issue revenue bonds shall not be exercised until* authorized by resolution or ordinance duly adopted *by each* of the public agencies participating in such agreement. Public agencies participating in such an agreement *may not withdraw* or in any way terminate, amend, or modify in any manner to the detriment of the bondholders said agreement *if* revenue bonds or obligations issued in anticipation of the issuance of said revenue bonds have been issued and are then outstanding and unpaid as provided for herein. Any revenue bonds for the payment and discharge of which, upon ma-

turity or upon redemption prior to maturity, provision has been made through the setting apart in a reserve fund or special trust account created pursuant to this chapter to insure the payment thereof, of moneys sufficient for that purpose or through the irrevocable segregation for that purpose in a sinking fund or other fund or trust account of moneys sufficient therefor, shall be deemed to be no longer outstanding and unpaid within the meaning of any provision of this chapter." (Emphasis supplied.)

■ Appellants argue that the rationale and basis of the special-fund doctrine are violated by chapter 236, Acts of the 63rd General Assembly, because the statute provides that the governmental units which are to supply the income to the bond-issuing authority, directly or by charges against its citizens, may not withdraw from the project while any bonds are outstanding and unpaid or unprovided for. Thus, they say, while the general credit of the participating units is exempted in one section, it is firmly pledged in another section. We do not agree.

Appellees maintain that under this legislation the public body's credit is not on the line, but concede that it may be legally obligated to collect for the services furnished its citizens under the agreement it has approved. We agree as we view it, under the submitted contract, Exhibit A, the municipality only agrees to collect revenues for services rendered its citizens until the bonds are paid off, and commits its property owners to use these services and pay those revenues for a prescribed period. In other words, under its contract the municipality cannot withdraw from its agreement and buy garbage disposal services from any other party until the revenues collected by the city from users therein are sufficient to pay off the existing revenue bonds. In fact, looking at the substance rather than mere form, the so-called taxes are really collections of revenues for services rendered and to be rendered

over a definite period as disclosed by the revenue bonds.

As pointed out by appellees, the statutory scheme here employed does not violate the delegation-of-powers theory because it concerns itself only with bonding procedures which come under the special-fund doctrine, and contemplates that the general credit of the political subdivision is not being pledged. The purpose of the requirements holding the units in the project until the bonds are retired is to avoid acts which would destroy the source of revenue necessary to liquidate the authorized bonds, and nothing else. Without that provision the revenue bonds would not be merchantable.

There is no merit in appellants' contention that this legislation might permit a participating agency to withdraw from the project and not use the services, in which case the public body must pay its part of the obligation consisting of the bonds' principal and interest, that such would then become a general obligation of the city or town, and, in fact, result in a general tax on its property owners, rather than a special tax for a special service.

The short answer to this contention is that once the municipality has consented to the revenue bond issue, it may not withdraw from the use of the service thereof until that obligation is no longer outstanding. This is not a commitment to pay for services not used. Available legal remedies such as mandamus or specific performance actions might be available to secure performance of the member, but in any event this would not necessarily result in the assumption of a financial obligation by the municipality and call for a general obligation tax. As long as the participating member may legally pass on the assessments for special service to the property owners, or assess the resident users of the service for this special service, there would be no direct tax required and no violation of the provisions of Article XI, Section 3, of the Iowa Constitution.

Appellants, however, argue this is not truly a special service or special-fund provision, because in such cases a property owner can reject the service without paying the assessment. We cannot agree that actual use is an obligation requirement. If the service involves the public health and welfare, as it does here, such a rejection would not relieve the property owner from the obligation to pay for such available service. See Young v. City of Ann Arbor, 267 Mich. 241, 255 N.W. 579, cited with approval by us in Interstate Power Co. v. Town of McGregor, supra, 230 Iowa 42, 57, 296 N.W. 770, 777. That case also involved revenue bonds for special services, i. e., sewage disposal services, and the court there held that a special fund established for the service was permissible and did not constitute a general obligation against the city.

In the instant case, as in Interstate Power Co. v. Town of McGregor, supra, compulsory exercise of the taxing power as a means of enforcing liability is expressly withheld, and the bond itself so notifies its holder. No property presently owned by the member could ever be called upon to pay for the new improvement. To constitute a debt against the member or town there must be an obligation which it must meet with its funds or property. In the case at bar the limited taxing power granted may only be used to collect fees for services rendered by the new entity and is not used to enforce general liability of the city for bonds. Thus, the member municipality under this legislation is only acting as a media for collecting fees for services rendered under the contract approved and entered into by its officers. As said by the Michigan court of similar bonds in Young v. City of Ann Arbor, supra, 267 Mich. 241, 253, 255 N.W. 579, 584:

"Such bonds are not payable by the city. It does not assume and agree to pay them. It can levy no tax upon the people for their payment. They are exactly what they purport to be, self-liquidating revenue bonds, and the purchaser thereof can have re-course for their payment only to the revenues to be derived from the operation of the sewage disposal plant."

Such revenue bonds cast no additional burdens upon the taxpayers of the municipalities. The property owners are furnished necessary services and are under only an obligation to pay for them as the legislature directed and the municipality procured. The participating units simply cannot withdraw and destroy the source of revenue once the bonds are issued. We are satisfied that the fact that charges for services rendered to the property owners shall be collected in the same manner as taxes does not destroy this fund's identity as a separate fund.

V. Section 3 of chapter 236 provides that only revenue bonds may be issued by the Agency and no authority is delegated to levy a general tax to provide for their payment. It is clear that the contemplated source of payment of this obligation is the revenue to be obtained from services rendered to the property owners of the members of the Agency. Thus, when bonds are issued with the approval of each member, there could be no withdrawal which would adversely affect the source of this necessary revenue. By unanimous approval of the bond issue by the members of the Agency this revenue is made secure, for then each member agrees to accept this service *for* its property holders and collect from them sufficient amounts to pay the Agency's assessments for that service. As we interpret this agreement, the members agree not to pay for that service themselves, but to collect for it from actual users in their respective areas and, when bonds are properly issued, the law creates a lien upon those revenues derived from the operation of that project. That this may be constitutionally done, see Young v. City of Ann Arbor, supra, 267 Mich. 241, 254, 255 N.W. 579, 584, and authorities cited therein; Faulkner v. City of Seattle, 19 Wash. 320, 53 P. 365; Dillon, Municipal Corporations, 5th Ed., § 198, on Obligations Payable only from a Special Fund.

The law itself provides that the participating public agencies may not withdraw from the agreement or project as long as the revenue bond obligation so incurred is *outstanding*. The meaning of "outstanding" is well spelled out so as to prevent detriment to the bondholders by a diminishment of that *revenue source*.

In order to establish and maintain sufficient revenue to meet its obligations, including that of maintaining an adequate bond fund to pay outstanding principal and interest, it appears the Agency is given the power to fix rates and charges for the contracted facilities and services and to assess these amounts to the participating public bodies, who shall then pass those costs on to those served within their boundaries in any manner that is legal. As clearly indicative of this special-fund intent, the legislature also provided that such participating bodies may secure the funds to pay their assessments to the entity by enacting ordinances fixing, establishing, and maintaining adequate rates for the individual's use of such services, and further provided they may make the obligation one of the property owner and collect those charges so made as general taxes when overdue.

Section 5 of this Act provides as follows:

"§ 5. *Source of payment: rate and charges, pledge of revenues.* Such an entity shall have the power to pledge all or part of the net revenues of a project or projects to the payment of the principal of and interest on the bonds issued pursuant to this chapter and shall provide by resolution authorizing the issuance of said bonds that such net revenues of the project or projects shall be set apart in a sinking fund for that purpose and kept separate and distinct from all other revenues of the entity. The principal of and interest on the bonds so issued shall be *secured by a pledge of such net revenues* of the project or projects in the manner and to the extent provided in the resolution authorizing the issuance of said bonds.

"Such an entity shall have the power to fix, establish and maintain such rates, tolls, fees, rentals or other charges and collect the same from the public agencies participating in the agreement or from private agencies or persons for the payment of the services and facilities provided by said project or projects. Such rates, tolls, fees, rentals or other charges shall be so fixed, established and maintained and revised from time to time whenever necessary as will always provide revenues sufficient to pay the cost of maintaining, repairing and operating the project or projects, to pay the principal of and interest of the bonds then outstanding which are payable therefrom as the same become due and payable, to provide adequate and sufficient reserves therefor, to provide for replacements, depreciations and necessary extensions and enlargements and to provide a margin of safety for the making of such payments and providing such reserves. Notwithstanding the foregoing such an entity shall have the further right to pledge to the payment of the bonds issued pursuant to this chapter, in addition to the net revenues of the project or projects pledged therefor, such other moneys that it may have and which are lawfully available therefor.

"In order to pay the rates, tolls, fees, rentals or other charges levied against a public agency by an entity for the payment of the services and facilities provided by a project or projects authorized by this chapter, *public agencies participating* in such an agreement shall *have the power* by ordinance to fix, establish and maintain, rates or other charges for the use of and the services and facilities rendered by said project or projects. Such rates or charges may be so fixed, established and maintained and revised from time to time whenever necessary as will always provide such public agencies with *sufficient revenue* to pay the rates, tolls, fees, rentals or other charges levied against it by the entity for the payments of the services and facilities provided by said project or projects. All such rates or charges to be paid by the owners of

**460**

real property, if not paid as by the ordinance provided, when due, shall constitute a lien upon such real property served by such project or projects, and shall be collected in the same manner as general taxes." (Emphasis supplied.)

Although this method of collecting revenue for the special fund is specifically authorized, appellees argue that any legal method of passing on the cost of this special service assessment to the actual user is acceptable and that no general obligation of the member public agency is contemplated or permitted.

We are satisfied the indebtedness permitted here falls squarely within the special-fund doctrine, and that the power to issue revenue bonds payable only from special funds which are solely derived by charges made of the users of the services provided by the Agency, is not an obligation of the members of the Agency to pay money therefor from general revenue sources.

■ When the whole statute is considered, we believe the legislature intended the charges made by the Agency were not to become general obligations of the participating members, but that the participating bodies were only to act administratively in passing on the costs of the services contracted for to those who may use them.

Constitutional debt limitation (chapter 236, section 3) allows the new entity created by agreement between the cooperating governmental units to issue revenue bonds to finance the joint project. Since these bonds must be authorized by the joint resolution of the governing body of each cooperating unit, are to be solely financed from the net revenues of the project, and are specifically not to be in any respect a general obligation of any of the participating governmental units, we believe the legislation is well within the rationale of Interstate Power Co. v. Town of McGregor, supra, 230 Iowa 42, 296 N.W. 770, which

sets forth what is called the special-fund doctrine. Also see Iowa Southern Utilities Co. v. Cassill (8 cir.), 69 F.2d 703; Green v. City of Mt. Pleasant, supra, 256 Iowa 1184, 131 N.W.2d 5; Chitwood v. Lanning, 218 Iowa 1256, 257 N.W. 345; Wyatt v. Town of Manning, 217 Iowa 929, 250 N.W. 141; Hubbell v. Herring, 216 Iowa 728, 249 N.W. 430; Iowa Hotel Ass'n v. State Board of Regents, supra, 253 Iowa 870, 114 N.W.2d 539; Brack v. Mossman, supra, Iowa, 170 N.W.2d 416. Also see Baker v. Carter, 165 Okl. 116, 25 P.2d 747, and Sheldon v. Grand River Dam Authority, 182 Okl. 24, 76 P.2d 355.

In Sheldon v. Grand River Dam Authority, supra, the court rejected the contention that the special-fund doctrine was not applicable for the reason that the Act pledges the revenues indirectly on the theory that the State would be coerced into stepping in if and when the project should fail and resort to taxation to save the investment, and it stated, "If in fact there is an indirect or contingent pledge of the revenues of the state, the doctrine is not appropriate, but the coercion anticipated * * * is based upon mere speculation and the resort to taxation is not indirectly or contingently contemplated by the act."

We are satisfied this power granted herein is only a limited power delegated to collect fees for services rendered to citizens by the new entity, not general taxing power for any unlimited amount for general purposes. So construed, in reality the city acts only as a conduit, collecting for the new entity fees for services rendered to citizens, and no more. General taxing power or credits of the city are not pledged. In fact, the municipality is little more than a collection agent of fees paid for these services.

Referring again to the special-fund doctrine, we find this in 15 McQuillin, Municipal Corporations, § 41.31, pages 364–365:

" * * * However, the doctrine does not permit a municipality to incur unlimited obligations merely because it can tap revenues derived from sources other than ad

valorem taxation. While it is true there are many cases in which, notwithstanding the creation of a special fund for the payment of the claim, the courts have held contracts void as in excess of the debt limit; yet such holdings are largely based upon the fact that, notwithstanding such special fund, the contracts have been so framed as to provide also for general liability upon the part of the municipality. * * *" This is not the case here.

VI. Appellants also argue the above plan violates Article XI, Section 3, of the Iowa Constitution, which limits the amount of indebtedness a public body may incur. The correlation between the amount of indebtedness and the value of taxable property is not shown, so this ground for attack on constitutionality is not proved.

VII. In summary of these general obligation contentions, then, we hold (1) that the legislation permitting the creation of this entity and its creation by the defendant members was legal and proper; (2) that the powers conferred upon it when created were limited powers delegated to it by the legislature and were properly guidelined; (3) that the assessments made under the contract were to establish a special-use fund, were to be collected for special services to property owners and users of the member public agencies, and did not become a general obligation of the member agencies, who could withdraw at any time *unless* all had approved a bond issue, in which case none could withdraw so long as that obligation was outstanding; (4) that the municipality, in fact, only acted in an administrative capacity to provide the service to their property owners and collect from them for the special service rendered by the Agency; (5) that these assessments made by the created entity never could become a general obligation of the member agency under the law and, therefore, could not violate Article XI, Section 3, of the Iowa Constitution.

VIII. Appellants next contend the trial court erred in holding that, although the county did not have authority to participate in the collection part of the services being furnished by the Agency, it could be a member of the Agency and a party to the contract, with assessments being made against it for that portion of the costs incurred by disposal of solid waste. The trial court reasoned that, since the law gives counties only the power to provide for a dump or sanitary land fill, and specifies the means of financing such facility by a levy of a tax not to exceed one-fourth mill on property in unincorporated areas of the townships served by the disposal grounds, and no power is conferred to provide its residents with a collection service or to pay for it, Polk County is powerless to participate in or to charge its residents fees assessed for collection services provided by the Agency. The trial court held:

"* * * Public agencies or political subdivisions of the state can exercise jointly only those powers, granted by the legislature, that they can exercise individually. The power to provide collection of solid waste to their residents has not been granted to counties in Iowa. That power cannot be inferred from the authority granted to provide disposal areas. Polk County can avail itself therefore only of the disposal services provided by the agency and is limited as to fees charged for disposal services to the one-fourth mill levy comprising the township dump fund referred to in Sections 332.32 and 332.33 Code of Iowa 1966. The fact that authority is given the agency to issue revenue bonds by Senate File 482, Acts of the 63rd General Assembly, does not prevent Polk County from being a member of the agency or from participating in the services provided by the agency to the extent that the said county is authorized by the legislature to provide those services to its residents."

We have serious doubts that under the power and authority specifically delegated to counties they could become a participating member in the Agency or, by ordinance or resolution, approve a proposed bond issue to raise revenue for collection and disposal costs as the law stood prior to

the enactment of Senate File 1232, Acts of the 63rd General Assembly, Second Session. The county here did not possess like power or authority in this field of public service with other participating municipal bodies. Although we could find no fault with the assumed obligation of the county to collect part of the cost of special services from the property owners, there is nothing in these legislative provisions to indicate that counties may participate if their power and authority is restricted and does not conform to that of the other public bodies, parties to the agreement. In view of the fact that the law now amended permits counties to fully participate in the activities of such agencies and, like municipalities, collect from its property owners for the special services rendered, it would seem necessary for the county here to rejoin the Agency and approve the revenue bond proposal.

■ IX. Appellants further contend that the agreement creating the Agency is contrary to public policy to the extent that it permits elected officials of the member municipalities to serve on the governing board of the Agency. They argue that the integrity of representative government demands that the administrative officials should be able to exercise their judgment free from the objectionable pressure of conflicting interests. We agree with that proposition, but do not believe it appears here that these members of the Agency board are in such a position. It is conceded that here there is nothing to indicate a personal pecuniary interest of those representatives is involved such as appears in Wilson v. Iowa City, Iowa, 165 N.W.2d 813, 820.

■ Although the members of the board understandably will want to keep the rates their constituents must pay as low as possible, they are well aware that rates must be maintained sufficient to meet the Agency's cost for such services. This is not such a conflict of interest as to be contrary to public policy or fatal to the agreement.

In passing on this question the trial court said, "Inasmuch as each representative is on the board primarily to serve as spokesman for the particular municipality or political subdivision he represents, (it could) * * * see no conflict of interest such as would likely affect his individual judgment by virtue of his status as an elected official." It pointed out no compensation is provided for such service and the representative serves at the pleasure of his municipality or political subdivision. We agree with the trial court.

In the recent case of Wilson v. Iowa City, supra, we discussed the issue of conflict of interest and held, where it appeared the official had a personal interest, either actual or implied, he would be disqualified to vote on a municipal project—in that case, urban renewal. No such interest would appear in connection with this project unless some litigation would occur between the municipality he represents and the Agency, in which event the contract itself provides for arbitration procedures. We conclude there is no merit in this assignment.

X. Having found no reversible error in the trial court's judgment except as to the participation of the county in the project prior to the enactment of Senate File 1232, Acts of the 63rd General Assembly, Second Session, which objection has now been resolved, we affirm its decision holding both chapter 28E of the 1966 Code and chapter 236, Acts of the 63rd General Assembly, are constitutional and that the contract entered into pursuant thereto, except as to county participation thereunder, is valid.

Modified and affirmed.

All justices concur except BECKER and LeGRAND, who dissent.

BECKER, Justice.

I respectfully dissent.

I concur in Divisions I and II.

I. It would be much easier and personally more satisfactory to simply concur in the

carefully documented opinion. The need for a cooperative solid waste agency for the metropolitan district of Des Moines is apparent and acute. All of us are keenly aware of such needs. But this need cannot allow the governmental units to assume unconstitutional authority in solving immediate problems. The dilemma thrust upon us by practical considerations is not new. Robert H. Bowmar, The Anachronism Called Debt Limitation, 52 Iowa L. Rev. 863, 890 states:

" * * * In many cases, perhaps, the judges confronted by these devices consciously disregarded a clear constitutional mandate, because the affected governmental unit's needs were made known to the bench too clearly. Such needs would go unfulfilled without judicial approval of the particular plan, or one with like intent. Some have claimed that present-day confusion and multiplicity of devices could have been, and still can be avoided by a strict constitutional interpretation which would void the arrangements, and thus rightly thrust upon the voters the obligation to alter their constitutions or go without their improvements. Perhaps, but amending constitutions is not a political task of which to speak lightly. Within the framework of devices we now have, generalization seems impossible. *But notwithstanding a posited community need for certain improvements, with the possible exception of well-regulated self-liquidating devices, it is submitted that, in the fact of debt limiting provisions, the means utilized to satisfy such need are not justifiable. They are not consistent with the avowed purpose of the restrictions as originally enacted.* Each of the considered devices is a barely-disguised technique for debt-ceiling avoidance and provides a vehicle for the possibly irresponsible imposition of excessive tax burdens upon a unit's property owners. We might simply leave this phase of the discussion with this understatement: 'A rapidly growing volume of court cases offers a bewildering array of judicial rulings on the concepts and issues involved in these various approaches to the avoidance of debt restrictions.' " (Emphasis supplied).

II. The first area of disagreement found is the purpose and effect of the statutes being construed. The device used here is described by Bowmar's article, supra, at 52 Iowa L.Rev. 863, 884: "The device which is of major importance today, due to the apparent resurgence of its application, is the so-called public authority." In commenting on the validity of the device Bowmar, with strong authority in support has this to say:

" * * * More basically, among the commentators there is a consensus that no justification exists for the exemption from debt limits which the public authority device enjoys. The exemption is of no avail where the authority might be found to be merely an agency of the state, thereby subjecting the state itself to scrutiny under an applicable constitutional provision. * * *. 52 Iowa L.Rev. 888, 889.

Since chapter 28E does not concern itself with debt limitation it is constitutional on the basis that it merely authorizes the component units to do jointly what they already had the power to do individually. But it must be remembered that the authorization is not merely for creation of a solid fill waste agency. The powers conferred cover road building, (op. Atty.Gen., June 29, 1966) and all other legitimate governmental activities such as public transportation systems, sewer systems, water systems, police and fire protection, et cetera.

III. The constitutionality of chapter 236, Acts of the 63rd General Assembly, is an entirely different matter. It involves the special fund doctrine which in turn is based on existing independent revenue. Once the special fund doctrine is accepted as a constitutionally permissible device for avoiding constitutional debt limitations under certain circumstances, the question becomes one of degree. Does the specific implementing legislation go so far as to evade or ignore the debt limitations? Or

does it present an acceptable device that can be said to fall outside the constitutional strictures and can thus legitimately be said to only avoid them? This is the real question here.

The public agencies in this case, like the Board of Regents in Farrell v. State Board of Regents, Iowa, 179 N.W.2d 533, decided September 2, 1970, seek to extend the special fund doctrine beyond constitutional limits. The doctrine allows governmental agencies to incur indebtedness based on anticipated revenue from nontax sources. In approving such action in Interstate Power Co. v. Town of McGregor (1942), 230 Iowa 42, 57, 296 N.W. 770, 777, we quoted Young v. City of Ann Arbor, 267 Mich. 241, 255, 255 N.W. 579, 584:

" 'Such bonds are not payable by the city. It does not assume and agree to pay them. It can levy no tax upon the people for their payment. They are exactly what they purport to be, self-liquidating revenue bonds, and the purchaser thereof can have recourse for their payment only to the revenue to be derived from the operation of the sewage disposal plant.' "

Interstate Power Co. v. Town of McGregor and Young v. City of Ann Arbor are different from the case at bar because neither case allows the city to collect fees from property owners *in the same manner as taxes are collected.* Couple such a provision with the prohibition against withdrawal of an agency from the project after the bonds are sold and the credit of the municipality's taxpayer is in fact pledged to payment of the bonds. These provisions pledge the taxable real property of the taxing district to the payment of the bonds in a fashion that goes far beyond anything heretofore approved by this court. The credit of the city and county *is on the line;* otherwise it would not be necessary to hold them in the contract for the bondholder's protection.

IV. All of this stems from failure of the legislature to supply sufficient guidelines in chapter 236. The distinction between revenue from a governmental function which must be performed even if it takes the power of taxation to supply the money and a governmental function that can be abandoned without resort to taxing power (or its equivalent) is not made. It is one thing to build an electric plant to replace a private utility, or build a parking lot, an auditorium, a stadium, or the like, any of which can be abandoned if the project doesn't pay off. It is quite another thing to organize an independent entity to furnish services which the citizens must accept and pay for on pain of loss of property through taxation and call these payments "revenue" which goes into a special fund.

To me at least the distinction is this. Where the service is to be rendered by the taxing unit to substantially all of the people and is considered so important that its financing must be implemented by involuntary payments by the taxpayers in the form of taxation, tax liens, or equivalent (collected like taxes), the revenue derived from the furnishing of such service is government revenue which will not give rise to the special fund theory. Where the service to be performed by the taxing unit is such that it may be accepted or rejected by the people and is not so important as to necessarily invoke the tax collection powers (or equivalent), then the income derived from such service is independent revenue which may qualify for the special fund doctrine. The fact the fees may be assessed and collected as taxes takes this case far beyond the holding in Farrell v. State Board of Regents, Iowa, 179 N.W. 2d 533, decided September 2, 1970. What is said in Farrell is not authority for what the action approved here.

As I read this statute and the majority opinion, the legislation presently considered is broad enough to allow county and city units to create a fire protection agency to service all citizens within the geographical boundaries of the new unit. Fees could be allocated to the private property protected and the fees could be collected like

taxes. The new unit could issue bonds predicated on the expectation of such fees. The whole scheme would be legal and would not count as to debt limitations imposed on the participating units. All of this can be done without the referendum process traditionally required for bond issues. This would appear to be an unacceptable evasion of the Iowa constitutional debt limitations. If this seems farfetched see City of La Habra v. Pellerin, 216 Cal.App. 2d 99, 30 Cal.Rptr. 752 (4th Dist., 1963).

The breadth of chapter 236 and the modus operandi urged by defendants in this case leave us in the position that all governmental functions may be funded by creation of separate units backed by fees and charges "to be collected in the same manner as taxes". This effectively bypasses the Iowa constitutional prohibitions in the same manner as if they were not written into the constitution in the first place.

This point is made by Bowmar:

"The revenue bonds are, by definition, evidences of obligations created for self-liquidating projects. In its purest form, the special fund theory which underlies revenue bond financing clearly lies without the limits of the constitutional provisions. The governmental unit is merely acting as the conduit through which payments pass to the bondholder; there is no danger that the general taxpayer will be burdened with increased taxes to cover the expenses of improvements meant to benefit a consuming subclass of taxpayers. So long as the limitations upon its use are applied with rigor, there appears little room for questioning a technique requiring payment for use according to degree of use. *A key factor would seem to be the degree of voluntariness associated with the project; are the users voluntarily assessed? If not, the situation is hardly distinguishable from that considered earlier under the special districting technique where excessive burdens are placed on certain taxpayers.* * * *

"Once a court has decided that we are not talking about a debt of the governmental unit in the constitutional sense, then we are not within the letter of the provision and all of the problems generated by circumvention would follow; the court pierces the veil covering the city's true role and recognizes the rate payers as the actual debtors. One is left with some misgivings at this point. If the 'improvement' is in the nature of a public utility, so that *all* the taxpayers are also all the rate-payers, saying that the rate-payers are the actual debtors hardly distinguishes the situation from one where it is the unit's debt. Because the unit's debts are, a fortiori, those of its general taxpayers, it would appear that this would constitute a misuse of an otherwise justifiable approach to handling improvement needs, leading to 'debts' beyond the allowable limits." 52 Iowa L. Rev. 879, 880. (Emphasis Supplied).

This factor would seem to distinguish the instant case from all other Iowa cases. The involuntary requirements that the governmental unit remain in the scheme and the involuntary nature of imposition and collection of fees is fatal. "Fees" as used here is little more than a euphemism for "taxes".

It seems to me the above distinctions must be recognized in this case or sometime in the near future. The task of "spelling out" such distinctions is essentially legislative. But this task has not been performed in chapter 236. Put differently there is no understandable guide line as to what source the funds may have in order to qualify as "revenue" within the "special fund" doctrine. Therefore there is an unconstitutional delegation of power in chapter 236.

V. One additional protest should be added. The plan devised under chapter 28E and chapter 236 allows all of the agencies to do collectively what they cannot do individually. That is, it allows substantial bond obligations to be created without a referendum as required by statute. Cf. Iowa Code, 1966, chapter 75, and sections

345.1, 407.3, 407.5. This is a very long step not heretofore authorized by the Iowa legislature or approved by this court. Again, this is done without guidelines.

I would reverse.

LeGRAND, J., joins in this dissent.