STATE ex Rel. WILSON, Relator, v. STATE BOARD OF EDUCATION et al., Respondents.

(No. 7,546.)

(Submitted March 24, 1936. Decided April 8, 1936.)

[56 Pac. (2d) 1079.]

*Mr. J. C. Garlington,* for Relator, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Walter L. Pope,* for Respondents, submitted a brief; *Mr. Pope* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

This is an original proceeding brought by relator, a student at Montana State University, in his capacity as a student and as a taxpayer, for the purpose of enjoining the proceedings of the respondent State Board of Education and the other named respondents, under Chapter 133, Laws 1935. The chapter authorized and empowered the State Board of Education to procure the erection of a journalism building at the State University in Missoula. It further authorized the board to apply to the United States government for assistance under the Federal Emergency Administration of Public Works.

The petition alleged that the State Board of Education adopted certain resolutions, which are attached thereto, and pursuant to which the respondents, on behalf of the State University, have made application to the Public Works Administration for a loan and grant of $180,000, to be expended in

the erection of a journalism building, the outright grant to be in the amount of $81,000 and the loan in the sum of $99,000. For the purpose of securing the loan, the respondents propose to pledge the income and interest from the fund created by the federal land grant to the state of Montana for the use of the State University, in accordance with the provisions of section 14 of the Enabling Act. It is alleged that the respondents propose to issue negotiable bonds to be secured by the pledge of the income and interest from the land grant fund, the bonded indebtedness to be retired over a period of thirty years on an amortization plan.

It is first important to understand the provisions of Chapter 133, supra. It is not necessary, however, to reproduce the chapter in its entirety. It is sufficient to say that, in substance, it provides as follows:

Section 1 of the Act gives to the State Board of Education the power to erect a journalism building at the university at a cost of not to exceed $200,000.

Section 2 provides (a) that the board may enter into such contract or contracts or other arrangement as the laws of Congress hereafter enacted or regulations adopted pursuant thereto may require for the purpose of procuring federal funds for the erection of the building; (b) that the State Board of Education is given power to make such contracts in such form as may satisfy the requirements of the United States in respect thereto; (c) that the purpose and intent of the Act are declared to be to give the State Board of Education full power to take advantage of such benefits and advantages as may be obtainable under the Act of Congress now contemplated; and (d) that there is conferred upon the State Board of Education full power to make such contracts and do such things as may be required to procure the erection of the building from funds provided by Congress under any public works program that may hereafter be enacted by Congress.

Section 3 provides a specific means of raising the funds for the erection of the building, but contains a statement that the

expression of the one means shall not limit or qualify the other means available to the State Board of Education.

Section 4 provides that no contract or obligation shall become a charge against the state of Montana, and that all obligations for the payment of moneys shall be payable solely from such funds as may be available from time to time to the State Board of Education for the operation and maintenance of the Montana State University.

Section 5 provides that it is the purpose to confer upon the State Board of Education full power to do all things and acts not in conflict with the Constitution of the United States or of the Constitution of the State of Montana, which the State Board of Education may find necessary or reasonably adapted to accomplish the object specified, viz., the erection of the journalism building.

Respondents' answer admits all allegations of fact contained in the petition, and in addition pleads the rules and regulations of the Public Works Administration enacted pursuant to the Federal Emergency Relief Appropriation Act of 1935 (49 Statutes at Large, p. 115, 15 U. S. C. A., sec. 728, note), and alleges that the board has caused plans and specifications to be prepared for the construction of the building, and that it has entered into negotiations with the government for the granting of a loan from the Public Works Administration, and that it intends to enter into the contract provided for in the application for the grant and loan as set forth in the resolution of the board. It affirmatively alleges that the board has made the application because the Federal Emergency Administration of Public Works of the government is the sole agency authorized by the United States to make loans or to provide funds for the purposes set forth in Chapter 133, supra, for the purpose of procuring funds and entering into contracts as provided in the chapter, and that all things done in connection therewith are pursuant to the authority of Congress applicable thereto, and have been and are required for the purpose of obtaining the benefits and advantages obtainable under the Act; that it is necessary to do such things, and that they are required by the

United States and the Federal Emergency Administration of Public Works; and that in fact the resolution adopted by the board to effectuate the purpose was prepared by the Federal Emergency Administration of Public Works and adopted by the board as the only means of securing the benefits mentioned in the chapter.

The answer, responding to the charge that all of the income of the land grant is to be pledged, sets forth that the average income from the university land grant fund for a period of thirteen years last past has been $27,819, and that the maximum that will ever be required to be paid under the plan during the life of the contemplated bonds will not exceed the sum of $7,240 in any given year. A table showing the income for the years mentioned is appended to the answer, showing that the greatest income for any of the years included was $33,648.72, and the lowest $20,900.

In the brief of relator the contentions and differences submitted to the court are summarized in three propositions:

1. That Chapter 133 gives to the State Board of Education no authority to borrow money, or expend money, for the erection of a journalism building, or to issue negotiable bonds or other evidences of indebtedness in connection therewith.

2. That Chapter 133, or no other law or constitutional provision, gives the State Board of Education any authority to appropriate and pledge the income and interest from the university land grant fund.

3. That the proposed indebtedness, pledge of income, and interest from the land grant fund, and repayment of the contemplated loan to the Public Works Administration over a period of thirty years, constitute a violation of the provisions of our state Constitution limiting and defining the manner in which appropriations may be made, indebtedness incurred, and state moneys expended.

These propositions are argued at length in the briefs of relator and respondents.

It is obvious from the case made by the pleadings that the legislative enactment under consideration is very broad

and comprehensive. It is true that it does not give the exact details to be observed in carrying out the purpose contemplated, but it does give the board abundant and liberal authority. The resolution adopted by the board under authority of the Act and under the Acts of Congress necessarily contains more details and more specific provisions to be observed in the actual execution of the purposes behind the enactment of the law. It is manifest that the plan contemplates a contract under the Montana Act and such federal laws as were then in effect and as might later be enacted by Congress and the regulations to be adopted in pursuance thereof.

No man can read the legislative Act, the resolution of the board, the federal Act, and the federal rules and regulations without arriving at the conclusion that all were directed to the main purpose of accomplishing just exactly what is sought in this instance—that is, the erection of a journalism building, with the resultant benefits of employment of labor and general relief of depression conditions. It is plain that the purpose of all of the steps taken and contemplated by both state and federal authorities from the beginning was the erection of a building and the making of improvements to be· paid for from money and means not ·then within the possession of or within the power of the state to expend under the existing conditions without aid from the federal government. That aid, it is apparent, was designed to come partly in the nature of a specific grant, the repayment of which was not required and which was extended for the purpose of aiding and encouraging the state in the financing of the improvement. It is true that the Montana legislative Act does not specifically say in so many words just what things are necessary to accomplish such purpose, but the broad language employed certainly justifies the belief that authority was given the board to do the lesser things required in the accomplishment of the major result.

The Act does not say in so many words that the Board of Education may borrow money or issue its negotiable bonds, but those two necessary steps must have been within the contemplation of the legislature and the board, and certainly were

within the contemplation of Congress and the federal authorities when the plan was designed and put into effect. We do not believe that it was necessary that detailed authority should have been included in Chapter 133 in order to make it possible to do the incidental things necessary in the circumstances. We agree with what was said in the case of *State ex rel. Priest* v. *Regents*, 54 Wis. 159, 11 N. W. 472, 475. There it was said in connection with such a matter: "But this does not mean that it can do no act except such as is specifically mentioned in the statute. It would be altogether impracticable to prescribe by statute the numerous and varying duties of such a board. Much must necessarily be implied from the character and objects of the corporation, the nature of the trust imposed, and the general powers granted."

A like result was achieved in the case of *McClain* v. *Regents of University*, 124 Or. 629, 265 Pac. 412. There it was contended that the Act under consideration contained no power to issues bonds, but the court held otherwise. A similar situation arose in Wyoming. The supreme court of that state in *Arnold* v. *Bond*, 47 Wyo. 236, 34 Pac. (2d) 28, gave consideration to the matter and held that, although the power to borrow money was not expressly given, it was clearly implied.

Considerable argument was presented and many cases were cited by relator that the authority could not exist in the circumstances of this case. It must be observed, however, that most of the authorities relied upon in that particular dealt with the power of municipal corporations, and did not relate to boards constituted as is the State Board of Education in this state. It is not necessary to enter into a discussion of the powers, functions, and limitations relating to municipalities. It is sufficient to say that, in our opinion, ample authority is contained in the legislative enactment, Chapter 133, supra, to justify the respondent board in its procedure. In the case of *Guillot* v. *State Highway Commission*, ante, p. 149, 56 Pac. (2d) 1072, attention was directed to the fact that officers and commissioners are not confined to those powers expressly granted by the Constitution or statutes. (See, also, 46 C. J. 1032.)

Relator asserts and relies upon the contention that the State Board of Education has no power to pledge the income and interest fund of the university. In this connection attention is called to the fact that section 4 of Chapter 133, supra, provides that "all obligations for the payment of money shall be payable solely from such funds as may be available from time to time to the State Board of Education for operation and maintenance of the said Montana State University." Pertinent, also, is section 14 of the Enabling Act, a part of which reads as follows: "And the proceeds shall constitute a permanent fund to be safely invested * * * and the income thereof be used exclusively for university purposes."

Subsection 12 of section 836, Revised Codes 1921, provides as follows: "The state board of education shall have power and it shall be its duty: * * * 12. To receive from the state board of land commissioners or other boards, or persons, or from the government of the United States, any and all funds, incomes, and other property to which any of said institutions may be entitled, and to use and appropriate the same for the specific purpose of the grant or donation, and none other; and to have general control of all receipts and disbursements of any of said institutions."

The meaning of the words "university purposes," found in section 14 of the Enabling Act, becomes important. The Act authorizes the use of the income and interest for such purposes. It it clear that the interest and income were specifically donated to the State University. By the provisions of section 836, supra, the control of that fund is vested in the State Board of Education. In the absence of any further grant of powers or restrictions thereon, it is apparent that section 836 allows that board at its discretion to use the interest and income fund for any valid university purpose. Section 4 of Chapter 133, supra, definitely recognizes the power of the State Board of Education to incur some kind of obligation, and provides that the board shall retire such obligations out of the moneys available for the operation and maintenance of

the university. If, then, the interest and income fund may be used for the operation and maintenance of the university, we see no reason why the board may not provide for repaying such obligations as may be incurred under the Acts here in contemplation. The contention chiefly involves the question of pledging such income, but the board by virtue of subsection 12 of section 836, supra, is given general control of all such receipts and disbursements. This can only be taken to mean that if the board has the power to spend the money, it has the power, within legal and proper restrictions, to promise to spend the money.

In this case the Act authorizes a total expenditure of $200,000. The present purpose of the board does not contemplate the expenditure of the maximum amount designated in the chapter. The amount of the bond issue is to be $99,000. It would seem that the right to do the things contemplated by the legislative authority contained in the enactment must certainly be upheld, unless there is clearly apparent legal impediment. We do not believe that there is any such impediment in this case. No authority has been cited to support such a contention. This view is supported by the recent decision of the supreme court of the state of Georgia. (*State* v. *Regents of University System*, 179 Ga. 210, 175 S. E. 567, 573; see, also, *Guillot* v. *State Highway Commission*, supra.)

Relator argues that the proposed pledge of the land grant income is contrary to the Constitution and to the Enabling Act. Part of what we have said on the point last discussed has a bearing on this question. This court had before it for consideration some matters very closely related to the point here involved, in the recent case of *State ex rel. Blume* v. *State Board of Education*, 97 Mont. 371, 34 Pac. (2d) 515. There we held that the construction of a building was within the legislative intent to be derived from section 17 of the Enabling Act. It is our belief that the words "university purposes," as used in section 14 of the Enabling Act, are as

broad as the words "maintenance and perpetuation," as used in section 12, Article XI of the Constitution.

Everyone knows that the purpose of the university is to educate the youth of Montana. It is recognized by all that in order to effectuate that purpose, buildings, laboratories, equipment and teachers are necessary. Relator argues that the land grant fund can only be used for strictly maintenance purposes, and that such purposes do not include the erection of buildings. In that respect he relies upon the case of *State ex rel. Koch* v. *Barret,* 26 Mont. 62, 66 Pac. 504, wherein the court had under consideration the land grant made to the Agricultural College, and wherein it was contended that Congress had specifically provided that the income and interest therefrom should not be used for the erection of buildings. In the case of *State ex rel. Blume* v. *State Board of Education,* supra, this court held that such was not the intent of Congress at the time the Enabling Act was passed, with reference to section 17 thereof. We do not believe that it was the intent with relation to section 14 either.

Relator points to certain statements found in the opinion in *Arnold* v. *Bond,* supra, the Wyoming case, to support his objection. In that case the court had under consideration a provision containing exactly the same language used in section 14 of the Enabling Act. The Wyoming court was of the opinion that the word "support," as used in the section corresponding to section 11 of our Enabling Act, modified the section relative to university purposes. It will be observed, however, that the court there held that, in view of the fact that the latter section used the words "for university purposes," the income was not confined to current expenses, but, if necessary and proper, that it could be used for the erection of buildings as well. In this view we concur.

It is contended that the proposed action of the board violates the provisions of section 12, Article XI, of our Constitution. These provisions have to do with the proposition of maintenance and perpetuation of the institution. As we have

suggested, this matter was covered in the *Blume Case*, supra. Relator asserts, however, that there is a difference between the facts of that case and the facts here, in that the plan under contemplation in that case was clearly of an emergency character, and that only one-half of the interest and income fund set aside for normal school purposes was pledged.

Here, the matter of emergency and necessity is specifically covered by the board in its resolution. We think this was sufficient. The other point is without merit. The reason that the whole income of the normal grant was not included lay in the fact that there are two normal schools in Montana, and it was recognized that each one of them was entitled to half of the income from that fund, so that the net result was that all of such funds payable to the Billings normal were pledged. As we observed in the statement of the case, while the legislative Act authorized the pledging of the whole fund, as a matter of admitted fact the pleadings make it plain that here not more than one-third of the income from the fund will ever be required to discharge the amortization payments, including interest. Both points are without merit. The statements contained in the *Arnold* v. *Bond* opinion, supra, and relied on in that connection, are not convincing in this particular, because of the fact that the matter was not there squarely before the court. The Wyoming court first held that the construction of the building was within the purview of the words "university purposes," as used in their Enabling Act, and that 10 per cent. of the interest and income fund could be pledged for the retirement of the bonds. The court did indicate that a pledging of the entire interest and income fund would be unconstitutional and illegal. The latter statement is not persuasive here, because of the difference in the conditions upon which the two matters were presented.

It is urged by relator that the proposed plan of the Board of Education is contrary to the constitutional provisions relative to state finances, appropriations, disbursements and indebtedness. The contention relative to indebtedness is con-

trolled by what we said in the cases of *State ex rel. Blume* v. *State Board of Education,* supra, and *State ex rel. Veeder* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516. It has also been generally held by other courts that where funds necessary to repay an indebtedness are to be derived from sources other than taxation, and where it is expressly provided that the bonds shall not become obligations of the state, the constitutional provisions relied upon do not apply. We think the *Blume Case* is sufficient authority against the contention; however, the case of *State* v. *Regents of University System* (Ga.), supra, covers the matter in very comprehensive language. There it was said: ''Regardless of the stipulations made, the state of Georgia could never be called upon to pay these bonds, nor would it be under any obligation, moral or otherwise, to levy any tax for the purpose of repairing any loss that might result to the university in consequence of these transactions, if the action of the board should ultimately prove. to be unwise and a loss should result. If the payment of any of these bonds from the income as pledged should by any chance cause such a drain upon the resources of the affected institution that it might be in need of increased appropriations· in order to function properly as an educational unit, the state would still be under no obligation to supply the deficit, even though it might desire to do so and actually do so.'' It will be observed that the form of bond set forth in the board's resolution, as shown in the pleadings, provides specifically that the bonds shall not constitute a debt, legal or moral, of the state of Montana. The proposed coupons contain like provisions. There is no merit in this contention.

The final objection urged by relator has to do with a proposed building fee to be imposed and devoted to the repayment of money borrowed from the federal government to erect the building. This objection is not pertinent, because of the fact that the board's resolution and the bonds make it plain that the application for the loan is based entirely upon the contemplated use of the interest and income fund, and not

upon funds derived from the use of the building fee. Nothing in the record discloses that the board has obligated itself, or intends to obligate itself, to make use of a building fee for the payment of the contemplated bonds. The legality of the proposed action of the board to apply the building fee fund to the payment of the bonds to be issued was discussed at some length by this court in the case of *State ex rel. Veeder* v. *State Board of Education,* supra. It is not necessary to review what was said in that instance. None of the authorities cited seem to us to be pertinent or important in the circumstances of this case.

A careful examination of the points raised by relator, and an examination of the authorities relied upon by him, convinces us that nothing has been presented to justify or warrant the belief that the legislature exceeded its authority when it enacted Chapter 133, supra, or that the respondent board is exceeding its authority in proceeding to effectuate the purposes outlined in the Act. The procedure adopted and the plans contemplated are not in conflict with, or violative of, any of the provisions of the Enabling Act or of the Constitution of Montana which have been called to our attention. Accordingly, the application for writ of injunction should be, and it is hereby, denied.

MR. CHIEF JUSTICE SANDS and ASSOCIATE JUSTICES MATTHEWS, ANDERSON and MORRIS concur.