John FARRELL, Ralph E. Patterson, James E. Johnson, Nicholas J. Sutton, Jr., Elaine Spencer and Bonita J. Rees, Individually and Representative of Persons Similarly Situated, Appellants,

v.

STATE BOARD OF REGENTS of the State of Iowa, Stanley F. Redeker, Ray V. Bailey, Donald L. Show, Mrs. H. Rand Petterson, William B. Quarton, Casey Loss, Thomas O. Lauden, Ned E. Perrin, Ralph H. Wallace and R. Wayne Richey, Appellees.

No. 54194.

Supreme Court of Iowa.

Sept. 2, 1970.

Nolan, Lucas & Nolan, Iowa City, for appellants.

Richard C. Turner, Atty. Gen., and Arthur O. Leff, Special Counsel, Iowa City, for appellees.

RAWLINGS, Justice.

· By class action in equity plaintiffs challenge validity of chapter 181, Acts of the Sixty-Third General Assembly, permitting issuance of self-liquidating bonds, by defendant State Board of Regents, to facilitate academic structural improvements at the three state universities, and for injunctive relief. Trial court held adverse to plaintiffs and they appeal. We affirm.

The cited Act provides, in part, the Board shall adopt a ten year building plan, subject to approval by both bodies of the legislature, and that annually the Board submit to the lawmaking body proposed projects to be undertaken in the ensuing year which, if approved by the legislature and governor, may then be effectuated.

By Senate Concurrent Resolution 44, both houses of the legislature approved the specific projects hereafter designated.

Senate Concurrent Resolution 45, having approval of the legislature and governor, authorized issuance of not to exceed $16,140,000 in bonds for the specific projects and undertakings therein described.

The legislature, by Senate File 696, chapter 50, Acts of the Sixty-Third General Assembly, appropriated $150,000 to reimburse the universities in the area of student tuition fees and institutional income to be expended for retirement of the bond debt authorized by S.C.R. 45, supra.

September 11, 1969, the Board adopted a resolution for issuance and sale of $1,155,000 academic revenue bonds in order to construct laboratories, classrooms, and offices for Aerospace and Civil Engineering, and Science Building #2 for the housing of zoology, entomology and psychology departments, all on the Iowa State University of Science and Technology campus at Ames. This particular bond issue apparently triggered the case now before us.

Projects at the State University of Iowa at Iowa City, and Northern Iowa University at Cedar Falls, await the outcome of this testing action, and if approved, the Board proposes to utilize the full bonding limit amounts authorized by S.C.R. 45 referred to above.

The statutes cited, resolution of the Board, and the bonds all provide they are not a state debt. Appropriated funds, designated fees collected and earmarked for other projects, such as funds from dormitories and other self-liquidating projects, are specifically excluded from any pledge or use for payment of the academic bonds in question.

Obligation for bonds issued, confined to student tuition fees and charges, with designated institutional income, will be adequate for the debt service schedule of required payments.

Interest rates on the bonds will depend upon their sale and a schedule to be determined for the required payments. As tuitions are collected there will be immediately extracted therefrom the amounts required for payment of the scheduled bonds and interest (sinking fund), and an accumulation required against any possible future deficiency for payment of the bonds (reserve fund). These will be set up, held, invested, and used as separate trust accounts for the bond debt service. They will not constitute general funds of any university.

"Institutional income", as defined by the Act and useable for bond payments, consists of earnings from sale of publications and other minor projects at the universities. If necessary such funds will be be used for bond debt service by a transfer to the special sinking and reserve trust funds. Bond issues presently authorized will obligate and use only a fraction of the tuition money collected. More specifically the record discloses that at all three institutions the present proposed bond issue can be easily liquidated by use of existing student fees and charges. Thus there need be no immediate resort to institutional income.

At the University of Iowa, in Iowa City, the amount of present student fees collected is 20 times that required for debt service on the proposed bond issue. An increase of only $1 per semester for each student will produce $30,000 a year for debt service.

The 19,000 students at Iowa State University, Ames, pay $200 for each of three quarters, of which $24 is set aside, including a $7 building fee, and $176 goes into general operating funds. $1.75 per quarter out of each student's tuition will be sufficient to retire the presently authorized $1,155,000 bond issue.

At the University of Northern Iowa, Cedar Falls, the situation is similar.

Whenever bonds are authorized and issued, the treasurer will skim from the tuitions, fees and charges collected at each institution, that portion necessary for bond debt service, immediately placing it in a special trust fund to be held and used for

that purpose only. As indicated above, there will be two parts to such trust: (1) the sinking fund, being the amount required for payment of principal and interest according to the schedule, and (2) the reserve fund, useable only if the sinking fund should ever be insufficient.

In the event student fees should sometime prove to be inadequate for payment of debt service currently required, the institution confronted with such a situation will have several alternatives. First, utilize institutional income as authorized by the Act and Board resolution. Second, increase student fees and charges. Third, retrench and curtail operations.

The Board is, however, obligated to charge and collect sufficient student fees which, with institutional income, will suffice to meet the debt schedule.

Propositions urged by plaintiffs in support of a reversal are, trial court erred in, (1) failing to find and hold the Act invalid and void as violating Article I, section 6, of the Iowa Constitution, and section 1 of the Fourteenth Amendment to the United States Constitution, because plaintiffs, and other students similarly situated, will be charged tuition for payment of bonds and interest thereon for the construction of buildings, structures and facilities which will never be used by them, and from which they will receive no benefits other than those enjoyed by members of the general public from whom no tuition or other charges are exacted for such purposes, thereby depriving plaintiffs of their property without due process and denying to them equal protection of the law; (2) failing to find and hold the Act invalid and void because it violates Article III, section 1, Constitution of Iowa, in that it attempts to grant an improper delegation of legislative and judicial authority; (3) failing to find and determine the Act is in violation of Article VII, sections 2 and 5, Constitution of Iowa, because the same permits the Board to incur an indebtedness of the State of Iowa in excess of $250,000 without im-

posing a direct tax for payment thereof and without approval of the voters of this state; (4) in failing to find and determine that "student fees, tuitions and charges" and "institutional income" of universities under jurisdiction of the Board are public funds of the State of Iowa and cannot be used except as appropriated by the General Assembly pursuant to Article VII, section 5, Constitution of Iowa.

I. At the threshold, these observations in Graham v. Worthington, 259 Iowa 845, 850–851, 146 N.W.2d 626, being singularly appropriate, are here repeated: "Our review is de novo. Section 624.4, Code, 1962, and rule 344, R.C.P.

"* * *

"It is of course understood the legislature may enact any law desired provided it is not clearly prohibited by some provision of the Federal or State Constitution. (Authorities cited).

"And in Green v. City of Mount Pleasant, 256 Iowa 1184, 1196, 131 N.W.2d 5, this court held: *The judicial branch of the government has no power to determine whether legislative Acts are wise or unwise,* nor has it the power to declare an Act void unless it is plainly and without doubt repugnant to some provision of the Constitution. There is no presumption against constitutional validity of a statute. Every reasonable presumption must be called to support the Act. A challenging party must overcome these presumptions and negative every reasonable basis which will sustain the statute. (Authorities cited). (Emphasis supplied).

"Then in State v. Fairmont Creamery Co., 153 Iowa 702, 711, 133 N.W. 895, 42 L.R.A.,N.S., 821, we said: 'The Constitution was intended to announce certain basic principles to serve as the perpetual foundation of the state. It was not intended to be a limitation upon its healthful development, nor to be an obstruction to its progress. New days bring new problems. Legislation must meet these problems as they come; otherwise our plan of government must

prove inadequate. Manifestly, we ought not to be swift to adopt such a technical or strained construction of the Constitution as would unduly impair the efficiency of the Legislature to meet its unavoidable responsibilities.'

"(Authorities cited)

"Also, if the constitutionality of an Act is merely doubtful or fairly debatable, the courts will not interfere. (Authorities cited)."

And Severson v. Sueppel, 260 Iowa 1169, 1174, 152 N.W.2d 281, 284, contains this pertinent statement: "In interpreting a statute we look to the object to be accomplished, the evils sought to be remedied, or the purpose to be subserved and place on it a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it."

Thus, in undertaking to void or defeat the subject legislative enactment, these plaintiffs assumed a heavy burden.

II. Their first thrust is directed to the matter of a claimed invalidating time lag between fees and charges to be collected from them and others similarly situated, and availability of the facilities to be constructed under the Act.

In this respect they take the position, section 8 of the Act empowers defendant Board to use fees and charges presently received from plaintiffs and other students without limitation as to time or amount. It is argued, a portion of all designated fees and charges so collected under sections 5 and 6 of the Act will be siphoned into funds from which payment will be made for construction of facilities they may never use or enjoy. Upon this premise it is claimed the Act violates Article I, section 6, of the Iowa Constitution, and section 1 of the Fourteenth Amendment, United States Constitution. Stated otherwise, it is urged there is here a classification without rational relation to statutory purpose, i. e., the law does not operate equally upon all within a given class.

Section 1 of the controverted enactment (chapter 181) provides: "The general assembly hereby determines that the annual revenues of the state are insufficient to finance the immediate building requirements and other facilities and utilities services requirements of the institutions of higher learning under the jurisdiction of the state board of regents and in order to provide these buildings, facilities and utilities services when they are needed, it is necessary to authorize the issuance of revenue bonds by the state board of regents, subject to the restrictions and limitations hereinafter set forth. It is the intent of the general assembly that revenue bonds issued for academic and administrative buildings and facilities and utilities services shall supplement and not supplant legislative appropriations for the same or similar purposes."

We considered the matter at hand in Keefner v. Porter, 228 Iowa 844, 848, 293 N.W. 501, and there said: "That classification may be adopted by the legislative branch of the government is conceded. But it is well established that a classification may not be arbitrary or unreasonable, and must be calculated to further some proper public purpose. The classification must provide for a basis which will effectually single into a separate class the persons or objects with which the purpose of the legislature is concerned. There must be a reasonable relationship between the purpose of the legislation, and the basis of the classification set out in the act."

Dickinson v. Porter, 240 Iowa 393, 35 N.W.2d 66, dealt with a problem comparable to that now being considered relative to constitutionality of an agricultural land tax credit act, and this court said, loc. cit., 240 Iowa 400–401, 35 N.W.2d: "If there is any reasonable ground for the classifications in this law and it operates equally upon all within the same class, there is uniformity in the constitutional sense and no violation of any constitutional provision invoked by plaintiff. (Authorities cited.)

"The statute amounts to a legislative finding there are sufficient differences between property to which the act applies and other property to justify the classification. We will not interfere unless plaintiff has proven the classification does not rest on a reasonable basis but is essentially arbitrary and palpably discriminating. (Authority cited).

"It is well recognized the legislature has a wide discretion in determining classifications to which its acts shall apply. Cook v. Hannah, 230 Iowa 249, 253, 297 N.W. 262, 265, and citations. * * *

"It is not sufficient that the court may regard the reason for the classification a poor one. (Authority cited). The differences upon which the classification is based need not be great or conspicuous."

■ Later in Dickinson v. Porter, supra, at 240 Iowa 416, 35 N.W.2d 80, we find these relevant observations. "The authorities agree not only that the legislature has the broadest discretion as to what is a public purpose but also that such question is a changing one. (Authorities cited). * * *

"A law may serve the public interest although it benefits certain individuals or classes more than others. (Authorities cited)."

Even more recently Brack v. Mossman, Iowa, 170 N.W.2d 416, was before us. In that class action plaintiff questioned validity of revenue bonds attendant upon construction of a multilevel university-connected parking ramp and invoked section 5, Article VII, Constitution of Iowa. He argued, in part, sections 262.44–262.53 were unconstitutional. We held otherwise, and in so doing said at 170 N.W.2d 421: "Plaintiff demurs to the manner in which the parking ramp is used because it is of convenience to staff, faculty and visitors as well as students. It is hard to imagine how the welfare of students could be served without either staff or faculty; and, it is equally difficult to understand, when discussing a hospital where students are being trained in all areas of health care how the fact that those who are visiting patients in that hospital may incidentally use the parking ramp renders it subject to plaintiff's objection." See also Green v. City of Mt. Pleasant, 256 Iowa 1184, 1199–1200, 131 N.W.2d 5.

Although, as aforesaid, taxation is not here involved, there is some degree of comparison and we have said in that regard: "(A) party is not deprived of property without due process by enforced collection of taxes merely because, in individual cases, [it] works hardships or imposes *unequal burdens*." (Emphasis supplied). Frost v. State, Iowa, 172 N.W.2d 575, 579.

Without question classrooms, laboratories and faculty offices are essential to our educational processes. And the task of every university is, if reasonably possible, to provide room and resources in ever expanding academic fields of endeavor.

In any event such facilities as may be constructed under the Act will more nearly serve the true educational function of our three universities than parking ramps or memorial unions.

It is also evident, any restriction of tuition and charges paid by each student to a specific building, classroom, chair or piece of equipment has never been and cannot be reasonably effected. Neither is such mandated by any equal protection, or other constitutional provision. See Frost v. State, supra, 172 N.W.2d 578–579.

Without question money received and funds established under the Act from students' fees and charges will be used for improvements which a given paying enrollee may never utilize. But that does not serve to place him in a class, absent some reasonable relationship. On the contrary, plaintiffs and those in the same position are treated equally.

Though not necessarily determinative, plaintiffs and others in like status are using facilities paid for yesterday, in part, at least, by students and others. By the same

token those of today will pay a reasonable portion of the costs for enhancement of academic facilities enjoyed by the students of tomorrow. Such is the price of progress for worthy public purposes. See in this regard Application of Board of Regents of University of Oklahoma, 200 Okl. 442, 195 P.2d 936, 939–940.

It would in fact appear, Iowa Hotel Ass'n v. State Board of Regents, 253 Iowa 870, 114 N.W.2d 539, is dispositive of the problem under consideration. There the plaintiffs, by class action, claimed unconstitutionality of the Act (chapter 185, Laws of the Fifty-Eighth General Assembly, sections 262.44–262.53, Iowa Code Annotated), under which defendant Board proposed construction of a self-liquidating addition to the Memorial Union at the University, Iowa City. Holding the challenged enactment valid, this court said at 253 Iowa 879, 114 N.W.2d: "The State University of Iowa is the property of the state. *It is primarily tax supported by appropriations by the legislature.* The service rendered, however, in the many fields of activity is not free. Tuition and fees of various kinds are charged. *The fact that a student may not participate or take advantage of every facility available does not mean that he is or should be relieved from paying student fees allocated to various projects.* The present Memorial Union was a gift to the state for the use of the university. It is used as an integral part of the whole university function. Its value as a part of the university service is not challenged." (Emphasis supplied).

We are satisfied the fees and charges to be earmarked under the Act for academic replacement and expansion apply equally to all in the same class.

■ It is to us evident there exists a reasonable relationship between purpose and the basis of classification, i. e., student enrollment and adequate educational facilities. Plaintiffs' first proposition is without substance.

Under existing circumstances we conclude the Act violates neither Article I, section 6, Constitution of Iowa, nor section 1, Fourteenth Amendment, United States Constitution.

III. The next question posed is whether chapter 181, Acts of the Sixty-Third General Assembly, is proscribed by Article III, section 1, Constitution of Iowa, as an improper delegation of legislative and judicial authority.

That issue, though not new, is usually novel because of the widely varying situations involved in each case.

■ It is now well established, "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." Spurbeck v. Statton, 252 Iowa 279, 286, 106 N.W.2d 660.

■ As stated, however, in J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406, 48 S.Ct. 348, 351, 72 L.Ed. 624: "This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."

See also Yakus v. United States, 321 U.S. 414, 425, 64 S.Ct. 660, 668, 88 L.Ed. 834; Wayman v. Southard, 10 Wheat. 1, 23 U.S. 1, 6 L.Ed. 253; and 27 Yale L.J. 892, 901.

In the case at bar the legislature did not give the Board carte blanche authority to use funds collected as it might "legislatively" determine. In fact sections 3 and 4 of

the Act require, (1) legislative approval of a prepared ten year building program, and (2) annual legislative authorization, with the governor's concurrence, as to any projects to be undertaken.

Moreover "project" is specifically defined in section 2, subsection 4, as limited to construction or replacement of buildings and facilities, in turn defined by section 2, subsection 3.

So, the Board is confined to projects first having legislative and executive approval, followed by nothing more than administrative supervision of construction and attendant liquidation of bonds issued, out of revenue derived from special nontax sources.

Thus we have here not only administrative guidelines but the absolute assurance of continued legislative direction and control.

In the same vein it follows that action taken at one legislative session cannot bind subsequently convened legislatures because the board must secure specific legislative and executive approval preliminary to any projects to be undertaken in any given year. This means each session of the legislature may approve or disapprove, and by that action the board is bound.

Furthermore, as in Iowa Hotel Assn. v. State Board of Regents, 253 Iowa 870, 114 N.W.2d 539, the record before us discloses receipts from designated sources are more than adequate to liquidate any existing approved projects to be undertaken. As a result they will be self-liquidating.

Even more important, and again dispositively, we said in Iowa Hotel Assn., supra, loc. cit., 253 Iowa 879–880, 114 N.W.2d 544: "The delegation of administrative duties is not a delegation of legislative authority or responsibility. The authority of the Board of Regents to fix tuition rates is not questioned. The administration of the physical property of the university is as much the responsibility of the board and the university administration as the teaching of anatomy, physics, literature or law."

Incidentally section 5 of the Act now before us, provides no tuitions subject to sections 262.43–262.66, Iowa Code Annotated, can be pledged for use in the retirement of any academic building bonds here involved.

In support of the proposition at hand plaintiffs cite and lean heavily on Lewis School District v. Johnston, 256 Iowa 236, 127 N.W.2d 118; Bulova Watch Co. v. Robinson Wholesale Co., 252 Iowa 740, 108 N.W.2d 365; State ex rel. Klise v. Town of Riverdale, 244 Iowa 423, 57 N.W.2d 63; State v. Van Trump, 224 Iowa 504, 275 N. W. 569; and Goodlove v. Logan, 217 Iowa 98, 251 N.W. 39. An examination of those cases discloses, however, they are neither factually similar nor legally applicable. Briefly stated, we find in each instance a distinguishing delegation of invalidating legislative power.

Finally, the Act provides it shall become effective immediately upon publication. Consequently the Board was authorized and directed to proceed with the specified collections and attendant processes as of that time.

To us it is apparent chapter 181, Sixty-Third General Assembly, involves no more than a lawful delegation to the Board of administrative power to act only in accordance with the broad policy prescribed, subject to recurrent legislative and executive approval.

We conclude plaintiffs have failed to establish any vitiating conflict of the Act with Article III, section 1, Constitution of Iowa.

IV. Next to be considered is plaintiffs' claim to the effect the Act transcends Article VII, sections 2 and 5, Constitution of Iowa.

More specifically we must now determine whether construction costs of non-revenue producing academic facilities on our three university campuses, financed by use of student fees, charges, and institutional income as defined by the Act, serve to create a constitutionally proscribed state debt.

542

The cited sections of Article VII, Iowa Constitution, provide: "Sec. 2. The State may contract debts to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the General Assembly, or at different periods of time, shall never exceed the sum of two hundred and fifty thousand dollars; and the money arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever."

"Sec. 5. Except the debts herein before specified in this article, no debt shall be hereafter contracted by, or on behalf of this State, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one news paper in each County, if one is published therein, throughout the State, for three months preceding the election at which it is submitted to the people."

Significantly, however, section 10 of the Act states: *"Under no circumstances shall any bonds issued under the terms of this Act be or become or be construed to constitute a debt of or a charge against the state of Iowa within the purview of any constitutional or statutory limitation or provision.* No taxes, appropriations, or other funds of the state of Iowa may be pledged for or

used to pay such bonds or the interest thereon but any such bonds shall be payable solely and only as to both principal and interest from the student fees and charges and institutional income received by the institutions of higher learning under the control of the state board of regents as provided in this Act, and the sole remedy for any breach or default of the terms of any such bonds or proceedings for their issuance shall be a proceeding either in law or in equity by suit, action, or mandamus to enforce and compel performance of the duties required by this Act and the terms of the resolution under which such bonds are issued." (Emphasis supplied). See also section 7 of the Act.

We refer again to Brack v. Mossman, Iowa, 170 N.W.2d 416. There this court said, at page 422: "The bonds which the Board intends to issue will pledge not only the income from the new parking ramp but also the income from the entire university parking system. It is this to which plaintiff objects.

"Before discussing this further we mention that *the method of financing set up in chapter 262, Code, is the so-called special-fund theory which has long been approved by virtually all states.* (Emphasis supplied)

*"It permits public improvements to be constructed without resort to taxation and without pledging the credit of the State to payment.* Payment is made from the income of the improvement itself. It is universally held such financing does not create a debt within the definition of that term as used in most state constitutions. (Emphasis supplied).

"That this is a popular and approved practice see annotations at 72 A.L.R. 695, 96 A.L.R. 1393, and 146 A.L.R. 328.

"Iowa is among the many states which have adopted its use. (Cases cited).

"Courts which have dealt with special-fund financing are split into two groups. Some limit the governmental unit involved to those projects which will be completely

self-liquidating from the income obtained from the new construction itself. Others permit the use of income from such construction and income from already existing facilities to defray the new construction costs.

"Plaintiff is asking us to adopt the first or *strict* special-fund doctrine rather than the last or *broad* theory. He relies most heavily on Boe v. Foss, 76 S.D. 295, 77 N.W.2d 1, 10, which accepted the strict theory in ruling income from existing university dormitories could not legally be applied toward financing new ones.

"The South Dakota court held the effect of permitting such withdrawal of money to which the State was already entitled inevitably required the spending of tax money to replace it. It held this created a state debt. Several other jurisdictions follow this formula.

"We make no attempt to distinguish this case from the present one. We only say it represents the minority view and one with which we cannot agree. As said in Lacher v. Board of Trustees, 243 Md. 500, 221 A.2d 625, 630, the South Dakota doctrine is followed by only 'a small minority of courts.'

"The overwhelming weight of authority is to the contrary. Most courts hold that financing such as the Board proposes here —when authorized by statute and when the State cannot become obligated to pay—does not create a debt against the State."

See also Iowa Southern Utilities Co. v. Cassill, (8 Cir.), 69 F.2d 703; Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5; Wickey v. Muscatine County, 242 Iowa 272, 46 N.W.2d 32; Interstate Power Co. v. Town of McGregor, 230 Iowa 42, 296 N.W. 770; Chitwood v. Lanning, 218 Iowa 1256, 257 N.W. 345; Wyatt v. Town of Manning, 217 Iowa 929, 250 N. W. 141; Hubbell v. Herring, 216 Iowa 728, 249 N.W. 430.

As against the foregoing persuasive authorities, plaintiffs cite and rely on State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737, which dealt with the "Road Bond Act". Involved there were *taxes*, not income from independent nontax sources. We held the Act bad for several reasons, i. e., failure to require repayment of the *tax indebtedness* within 20 years, pledging of license fees and *gasoline taxes* in lieu of a direct tax. Distinguishably that case did not even touch upon bond obligations to be paid out of special funds established from self-liquidating sources, separate and apart from any state debt.

█ It is thus evident the financing of public purpose projects by special funding, specifically exempting any tax obligation, does not create a state debt.

Here, Iowa Hotel Assn. v. State Board of Regents, supra, once more comes into play. In that case we also dealt with the matter of state debt, at the same time finding no constitutional bar to the collection of a "union fee" from each student, and use of funds received from that collateral source for the financing of structural additions. In so doing this court said, at 253 Iowa 879: "For the privilege of attending the university there is a charge for tuition. In addition, each student is assessed what is called a student fee. The student fee is collected for special and not general purposes. These include a season athletic ticket, subscription to the Daily Iowan and yearbook, hospitalization, concert and theater tickets, alumni magazine and class and organization dues. The funds so collected are allocated to the several purposes for which collected. For years there has been included a Union student fee. This is now $8.50 per student per semester and $4.00 per summer session. The funds so collected are paid to the Memorial Union Fund. This income has been estimated and projected to show that it will, during the period of the proposed indebtedness, retire 75% thereof. Earnings from the operation of the Union have been estimated to be sufficient to meet the remaining 25%. The receipts of the Memorial Union Fund from the various sources are from and incident to the Union building. The receipts

being adequate to retire indebtedness, the project is self-liquidating."

And in the same case, loc. cit., 253 Iowa 877–878, 114 N.W.2d 543, we stated: "It should be kept in mind that the constitutional prohibition relates to debts 'contracted by, or on behalf of this State'. In this case we are not concerned with what might be the authority of the Board of Regents in the absence of enabling legislation. The board in this case is acting within the scope of legislative authority and while so acting is limited thereby. *The undertaking of the board of regents is not a debt for which the state is responsible because the enabling statute so provides. * * * There is no appropriation under the law. There is no obligation, express or implied, by or in behalf of the state. The state does not promise to pay.* There is no alternative procedure by which the state would be required to pay. The state, speaking through the legislature, says that no one may obligate the state to pay. *When the enabling Act specifically negatives any charge against the state, there is no state debt within the meaning of the Constitution."* (Emphasis supplied)

On the other hand, in support of their position, plaintiffs cite and rely largely on Newell v. People, (1852), 7 N.Y.A. 9, 2 W.Y.C.A. 143, dealing with a constitutional state debt provision likened to that here involved. There the court struck down an act relative to a self-liquidating project holding it created a state debt because the pledging of such revenue had an effect upon financial conditions of the state, and an attendant resort to taxation might sometime become necessary. This is substantially the same view expressed in Boe v. Foss, cited in Brack v. Mossman, supra, and there repudiated.

Moreover, that holding is persuasively refuted in Sheldon v. Grand River Dam Authority, 182 Okl. 24, 76 P.2d 355. This case also focuses upon legislation which permitted the pledging of funds derived from a state self-liquidating venture. In upholding validity of the challenged Act the appellate tribunal aptly stated, at 76 P.2d 362: "The act in question falls squarely within the special fund doctrine as established in Baker v. Carter, supra (165 Okl. 116, 25 P.2d 747). The project is purely self-liquidating. The act does not pledge any existing revenues of the state or of the Authority, and does not pledge any revenue derived from taxation, either on an ad valorem basis or by special taxes. * * *

"The amici curiae contend, however, that the special fund doctrine as heretofore announced can have no application to the instant case for the reason that the act pledges the revenues of the state indirectly or contingently, on the theory that the state will be coerced into stepping in if and when the project fails, and resort to taxation to save a valuable investment. * * * We cannot adhere to such theory in the instant case, for to do so would in reality negative the application of the special fund doctrine in its entirety. If in fact there is an indirect or contingent pledge of the revenues of the state, the doctrine is not appropriate, but the coercion anticipated in the brief of the amici curiae is based upon mere speculation and the resort to taxation is not indirectly or contingently contemplated by the act. On the other hand, such theory is negatived by the provisions clearly establishing legal liability only against the special fund."

To all intents and purposes, we find the foregoing pronouncements determinative of the problem at hand.

Pursuing the matter further, and assuming for the moment all tuitions paid were once deemed to be for limited general purposes, that situation no longer prevails to the extent here involved. Under the Act *all* tuitions received, with specified exceptions, are to be channelled into a special fund, for the same uses as before, plus something new. In effect the Board is directed to henceforth include in tuitions charged, a sum sufficient to liquidate bonds issued for construction of authorized projects, then funnel that portion into two bond

debt service trust accounts. Resultantly the amount so separated and set aside becomes a special purpose fund by legislative fiat. In other words, pursuant to legislative direction, a part of each student's enrollment fee may be segregated and earmarked, under the Act, for special use at the institution attended, i. e., to aid in defraying expenses attendant upon construction of academic buildings and facilities. Unquestionably, the General Assembly had authority to so do.

With regard to the foregoing, it must be conceded that in most cases involving the special fund approach, bond obligations are payable out of revenue derived from a particular project or projects. But in the case now before us the obligations are to be paid out of student charges and other designated institutional income. That though does not alter the situation, since the underlying controlling principle is the same. In each instance the debt service is payable only from a special fund, absent any state obligation. In this respect see Button v. Day, 204 Va. 270, 130 S.E.2d 459, 461–462.

Additional authorities supporting the views expressed above are, Board of Regents v. Sullivan, 45 Ariz. 245, 42 P.2d 619; Miles v. Gordon, 234 Ark. 525, 353 S.W.2d 157; Lewis v. State Board of Agriculture, 138 Colo. 540, 335 P.2d 546; Hopkins v. Baldwin, 123 Fla. 649, 167 So. 677; State v. Regents of University System, 179 Ga. 210, 175 S.E. 567; State v. State Board of Education, 56 Idaho 210, 52 P.2d 141; State ex rel Fatzer v. Board of Regents, 167 Kan. 587, 207 P.2d 373; Caldwell Bros. v. Board of Sup'rs, 176 La. 825, 147 So. 5; Fanning v. University of Minnesota, 183 Minn. 222, 236 N.W. 217; State ex rel Wilson v. State Board of Education, 102 Mont. 165, 56 P.2d 1079; State ex rel Veeder v. State Board of Education, 97 Mont. 121, 33 P.2d 516; Application of Board of Regents, 195 Okl. 641, 161 P.2d 447; Conder v. University of Utah, 123 Utah 182, 257 P.2d 367; Spence v. Utah State Agr. College, 119 Utah 104, 225 P.2d 18; and State ex rel Board of Governors of West Virginia University v. O'Brien, 142 W.Va. 88, 94 S.E.2d 446.

We are persuaded and now hold, the "special fund" concept is applicable, and the Act does not create a state debt in contravention of Article VII, sections 2 and 5, Constitution of Iowa.

■■ V. Finally, plaintiffs urge the Act permits use by the Board of state public funds without legislative appropriation as required by Article VII, section 5, Iowa Constitution.

It at once appears the special fund theory previously explained and approved, is here again unavoidably interwoven.

Plaintiffs argue Code section 8.2 makes all student tuitions, fees and institutional income, "state funds", expendable only upon legislative appropriation.

By the enactment of chapter 181, Sixty-Third General Assembly however, that part of student tuitions, fees and institutional income to be separated and employed for bond retirement is, as previously disclosed, thereby made a special fund, thus permitting use thereof for designated purposes, subject to prior approval by the general assembly and governor.

If there is any conflict between Code sections 8.2 and chapter 181, then the later statute here serves in effect to redefine "state funds" in such manner as to exclude those collected under the Act for debt service relative to prescribed self-liquidating projects. Furthermore, chapter 181, being both a later and specific enactment must be held to control. Brightman v. Civil Serv. Comm. of City of Des Moines, Iowa, 171 N.W.2d 612, 618; Goergen v. State Tax Commission, Iowa, 165 N.W.2d 782, 787; and Rath v. Rath Packing Company, 257 Iowa 1277, 1288, 136 N.W.2d 410, 416.

In the dormitory, parking ramp and memorial union situations income derived from facility earnings or collateral charges respectively, were held not to be state

funds even though collected by a state agency.

The legislative Act involved in this case extends the same doctrine to that part of student tuitions, fees and institutional income required for bond retirement.

And, as aforesaid, the projects to be so financed must have prior legislative and executive approval before a university may embark upon any bond financed structural program.

Again plaintiffs rely upon State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737. But as already disclosed that case involved taxes, not money collected for use as special funds, and no self-liquidating program was there included.

In sum total, plaintiffs' argument appears to be answered by Frost v. State, Iowa, 172 N.W.2d 575, where this court held, the primary road fund, derived from gasoline and motor vehicle charges could be validly used to construct a bridge to the extent revenue bonds were insufficient, and to expend annual road fund receipts required for maintenance and operation of the structure.

This is much like the subject academic building bonds in that to the extent fees collected from students are inadequate, resort may be had to institutional income, and the facilities constructed ultimately become state property.

Bridge tolls are just as much income to the highway commission, and in turn the state, as are earnings from publications and other sources of revenue designated in the Act.

Also, the bridge act involved in Frost, supra, contemplates money advanced from the primary road fund shall eventually be paid out of income derived from operation of the bridge itself, in turn pledged to payment of revenue bonds. They are certainly collected by a state agency to which legislative appropriations are made.

Were this court to now adopt the view urged by plaintiffs, the effect would be to place on Code section 8.2 an unreasonable interpretation, at the same time inferentially overruling Frost, supra, and its predecessors. We do not propose to now adopt any such approach.

▆ Under our accepted broad special fund doctrine, pledging power is not, as heretofore demonstrated, restricted to the facility being constructed nor to income derived therefrom. Consequently when a statute permits the pledging to bond retirement of state agency receipts, such as the highway commission, then institutional income, when legislatively set apart for special purposes, should not be treated as "state funds" in the hands of the Board. Rather, as stated supra, they are actually separate special purpose funds for authorized usage. To this extent chapter 181 must be regarded as having redefined "state funds" to the extent here applicable.

In fact, it is specifically so differentiated by the Act. Section 8 defines "institutional income" as meaning income received by an institution from designated sources other than student fees or charges, with certain projects exempted. And section 10 specifies, in part, no taxes, appropriations or "other funds of the state" may be so pledged or used.

This means that in keeping with our broad special fund theory, the legislature chose to remove institutional income, set aside for bond retirement, from "state funds", either for the purpose of the enabling act itself, or under Code section 8.2. See in this regard Kenkel v. Iowa State Highway Commission, Iowa, 162 N.W.2d 762, 766.

▆ Obviously the legislature can and has determined that such receipts as are legislatively set aside from tuition fees and charges or income derived from university enterprises, and separated into special trust funds for retirement of bonds issued under the Act, are not then "state funds" re-

quiring legislative appropriation. In support hereof see Brack v. Mossman, supra, at 170 N.W.2d 424, and Iowa Hotel Assn. v. State Board of Regents, loc. cit., 253 Iowa 898, 114 N.W.2d 539. If any other approach were to be adopted no self-liquidating program could ever exist or be validly utilized by a state agency operating under *any* present or prospective legislative appropriation. Finally, as revealed, supra, such method of financing has previously been adjudged valid in Iowa and a great majority of other states.

From this it follows, the Act does not violate Article VII, section 5 of the Iowa Constitution.

VI. As previously stated, it is not for this court to pass upon the wisdom of the Act. In light, however, of the foregoing principles set forth in Division I hereof we are satisfied, plaintiffs failed to effectively sustain the good faith burden they assumed in challenging the constitutionality of chapter 181, Acts of the Sixty-Third General Assembly. Trial court was correct in so holding.

Affirmed.

All Justices concur, except BECKER, J., who dissents.

BECKER, Justice (dissenting).

I respectfully dissent from Division IV and the result. The special fund doctrine is so broadly interpreted here as to make Article VII, sections 2 and 5 practically meaningless.

Tuition is paid for current expenses. Defendants contend they may place all of this current expense income in a special fund and use it for debt retirement. The current expenses are to be paid by legislative appropriation from general State funds. The legislature can control contracts for future obligations but each successive legislature is confronted with obligations already incurred. It will be forced to provide replacement funds or see its entire University educational system break down.

This conclusion is amply demonstrated by the testimony of Robert W. Moore, Vice President for Business and Finance of Iowa State University:

*"The plan is for the Legislature to replace the money that we take out of student fees. * * ** 

*"The Plan is that we will use the tuition money we collect as an insurance to the bond buyers and expect the Legislature to replace it with appropriations so that we can maintain our current operating levels.* This fee is an insurance to bond buyers by being pledged to support the debt service. We expect there will be funds appropriated to replace that debt service each year. * * *.*

*"It is generally understood by the officials at Iowa State University that the whole underlying theory of this bonding program for academic buildings is that the Legislature will replace all fees and charges which are used to finance the payments of bonds and interest on those building projects so that the University standards and operating levels will remain the same. If, for any reason, we had inadequate funds for operation and we had to curtail our services, that is our instructional service and the standard of courses offered, this would have a detrimental effect upon the student body and may jeopardize the income from tuition. It is our hope that the Legislature will make up annually the amount of money used for bonding in the form of appropriations. If that was not done, I do not think the bonding procedures would be desirable. I do not think it would be desirable to finance capital additions by bonding if this was not the approach. A more desirable approach would be to provide direct appropriations for the capital additions."* (Emphasis in record).

The State's argument frankly concedes the above assessment of the situation is substantially correct. Iowa cases allowing issuance of revenue bonds are not in point. The distinction is clearly made in plaintiff's brief. "None of those cases are

**548**

applicable as the instant Act does not require and the instant project does not foresee that the 'revenue bonds' will be paid for wholly out of revenue arising therefrom, to the contrary, the record shows there will be insufficient revenue to retire the bonds." This is simply debt management by the legislature—the very thing the constitutional prohibition is designed to prevent.

Put differently, the special fund theory has its use where a facility designed to be self-liquidating is contemplated. This might even be stretched to allow use of funds from other self-liquidating projects to bolster the weaker projects. But at this point the process should stop.

The difficulty is in the short step from "revenue bonds" (which give the theory legitimacy) to "special fund" (which allows evasion because the source of the special fund may indeed be tax money). If the special fund is to be proper the source of its income must also be proper. For me at least, this is not demonstrated here.